12 CIV 7094

SANJAY WADHWA
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
Room 400
New York, New York 10281
(212) 336-0181



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :
:
                       Plaintiff, :
:
   -against- :
:    COMPLAINT
WALDYR DA SILVA PRADO NETO, :
:    ECF CASE
                      Defendant. :
:
------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Waldyr Da Silva Prado Neto ("Prado" or "Defendant"), alleges as follows:

## SUMMARY

1. This case involves insider trading by Prado in the securities of Burger King Holdings, Inc. ("Burger King") in advance of Burger King's September 2, 2010 announcement that it would be acquired by affiliates of 3G Capital Partners Ltd. ("3G Capital"), a New York-based private equity firm, for $24 per share (the "Announcement"). As a result of the Announcement, the closing price of Burger King's stock increased approximately 43% over its August 31 closing price and approximately 25% over its September 1 closing price.

2. Prado, while a registered representative at Wells Fargo Advisors, LLC ("Wells Fargo"), misappropriated material nonpublic information about the acquisition of Burger King

from one of his brokerage customers (the "Customer") who invested at least $50 million in the fund that 3G Capital used to acquire Burger King. Prado used this information to trade Burger King securities, and tipped at least four other customers, including Tippee A who traded Burger King securities on the basis of this information through accounts Tippee A controlled but that were held in the name of an entity ("Tippee A's Entity"). Prado, Tippee A, and Prado's other customers cumulatively reaped total profits of over $2 million.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

3. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks a permanent injunction against the Defendant, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]. The Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78aa].

5. Venue lies in this Court pursuant to Section 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the

facilities of a national securities exchange. During the time of the conduct at issue, shares of Burger King stock were traded on the New York Stock Exchange ("NYSE") under the symbol "BKC" and 3G Capital's main office was located in New York, New York.

## DEFENDANT

6. **Prado**, age 42, is a Brazilian citizen with an L-1B visa. Prado had been residing in Miami, Florida until he recently fled to Brazil. Prado also recently listed his Miami condominium for sale. From 1999 through May 2012, Prado was employed as a registered representative at Wells Fargo or its predecessor entities. In May 2012, Prado began working as a registered representative for Morgan Stanley Smith Barney ("Morgan Stanley") where he worked until he was terminated on September 13 for job abandonment. Prado holds Series 7, 53, 63, and 65 licenses.

## RELEVANT ENTITIES

7. **Burger King** is a Delaware corporation headquartered in Miami, Florida. It is the parent of Burger King Corporation, a Florida corporation that franchises and operates fast food hamburger restaurants under the Burger King brand in the U.S. and abroad. Until October 2010, its stock was listed on the NYSE under the symbol "BKC" and its options traded on various exchanges, including the Chicago Board Options Exchange. Burger King was a private company through June 2012. In April 2012, Burger King announced that 3G Capital would sell a 29% stake to a British investment firm. After the merger with the British firm, a new entity Burger King Worldwide Holdings, Inc. began publicly trading on June 20, 2012 and is currently traded on the NYSE under the symbol "BKW."

8. **3G Capital,** a Cayman Islands exempted company, is a private equity firm with its main offices in New York. 3G Capital is the manager of 3G Capital Special Situations Fund

II L.P. (the "Fund"), a Cayman Islands exempted limited partnership, which controls Blue Acquisition Sub, Inc., the Delaware corporation that purchased Burger King.

## FACTS

**3G Capital's Agreement to Acquire Burger King**

9. In late 2009, 3G Capital began considering Burger King as a possible investment opportunity for the Fund. 3G Capital first contacted Burger King about its interest in the company in February 2010.

10. On March 29, 2010, 3G Capital made its first offer to acquire Burger King at $24 per share in cash. Burger King rejected this initial offer, but continued discussions with 3G Capital regarding a potential acquisition. As part of these discussions, Burger King and 3G Capital executed a confidentiality agreement on April 26, 2010.

11. 3G Capital sent a second offer to Burger King expressing its interest in acquiring Burger King at a price of $25 per share in cash on May 11, which Burger King later rejected. Burger King and 3G Capital continued their discussions about a possible acquisition throughout June and, on June 29, 2010, 3G Capital sent a third offer to Burger King expressing an interest in acquiring the company at a price of $23 per share. The letter also included terms for the merger agreement pursuant to which 3G Capital proposed to complete the transaction.

12. Burger King rejected the third offer on July 1, 2010 and between July 1 and July 27, the parties did not have any further contact. 3G Capital continued to work internally on the transaction during this time period, however. On July 27, the parties resumed their discussions and continued to finalize the terms of the transaction throughout August. On August 3, 2010, the parties proposed to complete the transaction through a tender offer directly to the Burger King

stockholders with a back-end merger through which the acquisition could be completed if the tender offer failed.

13. Between August 3 and September 2, 2010, Burger King and 3G Capital took substantial steps toward the tender offer. In particular, Burger King and 3G Capital had multiple meetings to finalize the terms of the deal, such as pricing, financing, and management retention. During this time, Burger King also set up a limited access online data room with due diligence materials to which 3G Capital and its advisors had access. The Burger King board also had several meetings where it considered the terms of the deal.

14. On August 31, 2010, 3G Capital's investment bankers contacted Burger King's bankers and communicated that 3G Capital was willing to acquire Burger King at a price of $24 per share.

15. All aspects of the negotiations between 3G Capital and Burger King and due diligence were nonpublic.

16. 3G Capital took steps to ensure confidentiality such as requiring investors in the Fund and advisors to sign confidentiality agreements, which prohibited them from disclosing information about the proposed Burger King acquisition. 3G Capital also referred to the Burger King acquisition by the code names "Project Blue" or "Blue."

17. On September 2, 2010, before the opening of trading, Burger King and 3G Capital issued a joint press release announcing that they had entered into a definitive agreement under which affiliates of 3G Capital would acquire Burger King stock at $24 per share, or $4 billion, including the assumption of the company's outstanding debt. The offer price represented a 46% premium to Burger King's share price on August 31, 2010.

18. Between March 29, 2010, the date of 3G Capital's first offer, and August 31, 2010, Burger King's stock traded between a low of $16.41 and a high of $22.06 on average volume of 1,597,926.

19. On October 15, 2010, 3G Capital announced the successful completion of the tender offer with over 93% of shares tendered.

**Prado's Customer Invested in the 3G Capital Fund Used to Acquire Burger King**

20. On March 14, 2010, the Customer signed a confidentiality agreement with 3G Capital. After signing the agreement, a 3G Capital partner informed the Customer that Burger King was the potential target of the acquisition. The Customer committed to invest at least $50 million in the Fund individually and/or through entities he controlled.

21. The Customer who invested in the Fund has been a brokerage customer of Prado's for the past ten years or so. As part of this 10-year relationship, the Customer had a history of sharing confidential, financial information with Prado. Prado understood that, as a registered representative, he was expected to maintain the confidentiality of customer information.

22. After signing the confidentiality agreement in March 2010, the Customer was periodically informed about the status and progress of the Burger King acquisition by certain 3G Capital partners.

23. After the Announcement on September 2, 2010, the Customer satisfied his commitment to invest in the Fund by transferring at least $50 million to a Wells Fargo brokerage account, which was then transferred to a 3G Capital account. Prado acted as the registered representative for this Wells Fargo brokerage account. When Wells Fargo questioned Prado about the large transfer of funds by the Customer, Prado was well aware of the reason for the

transfer. He explained "[t]his client is buying 10% of a company with this money" and attached several documents regarding the Fund that identified 3G Capital.

**Prado's Contacts with the Customer Who Invested in the Burger King Deal**

24. Between March 14, 2010 and September 2, 2010, Prado communicated with the Customer or professionals working for the Customer in person, by e-mail, and over the phone.

25. Prado traveled from Miami to Brazil in March, May, and August 2010, and during each of these visits made brief separate trips to the Brazilian town in which the Customer resides.

26. On March 16, 2010, after the Customer signed the confidentiality agreement with 3G Capital, Prado met with the Customer at his residence in Brazil.

27. Prado also communicated with the Customer during a May 2010 trip to Brazil. In particular, on May 10, 2010, while in Brazil, Prado made a 4 minute and 6 second phone call to the Customer.

28. During that same May 2010 trip, Prado spent three days in the town in Brazil in which the Customer resides meeting with other customers and potential customers. On May 21, 2010, when Prado returned to Miami, he prepared internal due diligence documents for an account that the Customer had opened at Wells Fargo.

29. When Prado was in Brazil in August, he again communicated with the Customer. On August 12, 2010, Prado had a 1 minute and 24 second phone call with the Customer and thereafter communicated with the Customer's assistant either in person or by telephone.

30. Prado communicated by phone with the Customer's assistant at least 25 times between August 17 and September 2, when the deal was publicly announced. Prado also communicated by phone with the Customer at least four times between August 16 and September 1, 2010.

**Prado Purchased Burger King Securities on the Basis of Material Nonpublic Information Misappropriated from the Customer**

31. Based on the material nonpublic information Prado learned and misappropriated from the Customer, Prado purchased Burger King stock and/or call options in May, June, August and September 2010.

32. Prado began trading in Burger King on May 17, 2010 during one of his trips to Brazil. That day, he purchased 300 Burger King call options with an expiration date in July 2010 and a strike price of $20.

33. A "call option" is an option contract that gives the buyer the right, but not the obligation, to purchase a company's stock at a set price (the "strike price") for a certain period of time (through "expiration"). In general, one buys a call option, or call, when the stock price is expected to rise, or sells a call when the stock price is expected to fall. For example, one "July 2010 $20" call on Burger King stock would give the purchaser the right to buy 100 shares of that stock for $20 per share before the call expired in July 2010. If Burger King stock went above $20 before the call expired, the call owner could either exercise the call and acquire the stock at $20 per share, or sell the call, which would have increased in value. If Burger King's stock price failed to reach the $20 strike price before the call expired and the holder had not sold the option, the call would expire worthless. If at the time of purchase the call strike price is above the price at which the stock is then trading, the call is "out-of-the-money" because it would be unprofitable to exercise the call and pay more for the stock than if it were purchased on a stock market. For a given expiration month, out-of-the-money options are cheaper to buy than those that are conversely "in-the-money" to afford the buyer increased leverage to compensate for the increase in risk.

34. The July $20 calls that Prado purchased on May 17, 2010, were slightly in-the-money at the time of purchase because Burger King's stock price closed at $20.07 on that day. The stock price declined to $17.22 by July 16, however, and the options expired worthless.

35. Prado's May 17 trading in Burger King was prompted by information he learned during his trip to Brazil. The evening of May 17, 2010, Prado sent an e-mail written in Portuguese to a friend in Miami. Prado's e-mail stated "[t]o no Brasil com uma informacao que nao da pra mandar por e-mail. E imperdivel...," which translates to "I'm in Brazil with information that cannot be sent by email. You can't miss it...."

36. After receiving the e-mail, Prado's friend called him and the two had a 17 minute and 54 second phone call during which Prado told him that he heard that 3G Capital was going to take Burger King private. The friend, a hedge fund manager, told Prado that he should not trade on this information and should not have any of his customers trade. Prado's friend understood that during his trips to Brazil Prado met with customers.

37. After May 17, 2010, Prado continued to purchase Burger King securities as follows:

    a. June 3, 2010: 7,000 shares of Burger King stock;

    b. August 25, 2010: 13,000 shares of Burger King stock;

    c. August 25, 2010: 100 Burger King call options with a strike price of $20 and an expiration date of January 2011; and

    d. September 1, 2010: 9,000 shares of Burger King stock.

38. Prado sold all of his Burger King stock and options positions on the date of the Announcement for total profits of over $175,000.

## Prado Tipped Tippee A and Other Customers Who Traded Burger King Securities

39. The sequence and pattern of contacts and trading demonstrates that Prado not only traded on the basis of the material nonpublic information that he misappropriated from the Customer, but that he also tipped another customer of his, Tippee A, who traded on the information.

40. Tippee A has been a customer of Prado's since 2008. Prado described Tippee A as a "big client" and recognized that it was important to show "this big client you have potential investment ideas in order to make a commission and have a better life."

41. On May 17, 2010, minutes after Prado sent the e-mail to his friend in Miami who runs the hedge fund, he sent a similar e-mail to Tippee A. The e-mail written in Portuguese said, " ... Se voce estiver por ai me ligue aqui no hotel ...Tehnho uma info que nao vou usar meu cel pra falar. Imperdivel," which translates to " ... if you are around call me at the hotel ... I have some info...You have to hear this."

42. After receiving the e-mail on May 17, Tippee A called Prado at his hotel and the two had an approximately 10 minute phone conversation. This conversation occurred on the same day that Prado told his friend he had heard that 3G Capital was going to take Burger King private.

43. The day after receiving Prado's e-mail and the phone call with Prado, Tippee A began trading out-of-the-money Burger King call options. In particular, on May 18 and May 19, 2010, Tippee A purchased 2,850 Burger King call options with a July 2010 expiration date and a strike price of $22.5 through accounts Tippee A controlled but that were held in the name of Tippee A's Entity.

44. Although Tippee A had a brokerage account with Prado, Tippee A placed the May trades and later trades of Burger King call options in brokerage accounts held in the name of Tippee A's Entity that were maintained at two other brokerage firms.

45. Prior to May 2010, Prado and Tippee A had not traded Burger King securities.

46. Between May 2010 and September 2, 2010, Prado and Tippee A communicated by phone at least 23 times. During this time, there was no trading activity in the account Tippee A maintained with Prado.

47. In May or June 2010, Prado informed Tippee A that the Customer, who Prado described as being linked to the founders of 3G Capital, had asked Prado not to invest his money long-term so that the Customer could have ready access to his funds.

48. Tippee A continued to purchase Burger King call options in June 2010. Between June 2, 2010 and June 17, 2010, Tippee A purchased 2,000 Burger King call options with a July 2010 expiration date and a strike price of $20. Tippee A's July 2010 Burger King call options expired worthless.

49. Despite losing money on July 2010 call options, Tippee A began purchasing Burger King call options again in August 2010 after communicating with Prado by e-mail.

50. While Prado was in Brazil on August 18, 2010, Tippee A sent Prado an e-mail asking in Portuguese "o negócio do sanduiche vai sair?" which translates to "[i]s the sandwich deal going to happen?" Prado responded "Vai sim," which translates to "Yes it's going to happen."

51. Also on August 18, 2010, Tippee A sent Prado another e-mail asking again in Portuguese whether the "sandwich deal" was going to happen and Prado responded "[t]a nos trilhos 100%. Fiquei sem graca de perguntar o timing. A ultima vol e que atrapalhou," which

translates to "[e]verything is 100% under control. I was embarrassed to ask about timing. The last 'vol' got in the way."

52. Prior to these e-mails with Tippee A, Prado communicated with the Customer or the Customer's assistant in person or over the phone. In particular, on August 12, 2010, Prado and the Customer communicated during a 1 minute and 24 second phone call. Prado also had a meeting with the Customer's assistant in Brazil on August 14 and phone records show that Prado communicated with that same assistant on August 17 and 18.

53. During this same time period, Prado was asking his assistant at Wells Fargo to send him information about the Customer's account. Notably, Prado asked his assistant at Wells Fargo for information about the same Wells Fargo account that the Customer used to facilitate the transfer of the Customer's investment with 3G Capital.

54. On August 19, the day after his August 18 e-mail exchanges with Prado, Tippee A purchased 1,400 Burger King October call options with a strike price of $17.5 and 206 Burger King October call options with a strike price of $19.

55. Tippee A also purchased an additional 1,794 Burger King October call options with a strike price of $19 on August 26 and August 27. Tippee A and Prado communicated by phone in the days prior to these purchases. Tippee A and Prado had a 32 minute and 6 second phone call on August 24 and a 7 minute and 18 second phone call on August 25.

56. On September 2, after news about the deal became public, Tippee A e-mailed Prado asking in Portuguese "[a]lguma notícia do preço que vão pagar pelo sanduíche?" Translated to English, this e-mail asks whether there is "[a]ny news about price they will pay for sandwich?" In response to an e-mail from Prado about the price per share information of the Burger King deal, Tippee A wrote in English "Wow! What a day!"

57. Tippee A sold Tippee A's Burger King options after the Announcement for total profits of over $ 1.68 million.

58. Between May 17, 2010 and August 26, 2010, at least three additional customers of Prado's traded Burger King stock and/or call options reaping total profits of nearly $220,000.

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

59. The Commission realleges and incorporates by reference paragraphs 1 through 58, as though fully set forth herein.

60. Prado learned material nonpublic information concerning 3G Capital's acquisition of Burger King from the Customer in the course of his confidential relationship with the Customer. As a registered representative, Prado understood that he owed a duty of trust or confidence to the Customer to maintain such information in confidence, including information concerning the Customer's planned investments.

61. The confidential information regarding the impending Burger King acquisition was material and nonpublic. Prado was aware that such information was material and nonpublic given his experience as a registered representative.

62. As a result of his nearly 13 years of experience in the investment industry, Prado also knew or should have known that it was a violation of the securities laws to purchase Burger King securities while in possession of material nonpublic information.

63. Prado breached his duty of trust or confidence to the Customer when he misappropriated confidential information, traded for his own account and tipped Tippee A and at least three other customers with material nonpublic information regarding the Burger King acquisition. Prado knew or should have known that Tippee A and Prado's other customers

13

would trade on the basis of the information he provided, or was recklessly indifferent as to whether they would trade.

64. Either directly or indirectly, Prado gained, or expected to gain, a personal benefit by tipping Tippee A and his other customers with inside information.

65. By virtue of the foregoing, the Defendant, singly or in concert with others, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

66. By virtue of the foregoing, the Defendant, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## CLAIM II
### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder

67. The Commission realleges and incorporates by reference paragraphs 1 through 66, as though fully set forth herein.

68. Prior to the public announcement of the tender offer for Burger King, and after a substantial step or steps to commence the tender offer had been taken, Prado purchased securities of Burger King while in possession of material information relating to the tender offer, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from a person acting on behalf of the offering person; the issuer of the securities

sought or to be sought by the tender offer; or an officer, director, partner, employee, or other person acting on behalf of the offering person or such an issuer.

69. By reason of the foregoing, the Defendant violated, and unless enjoined, will again violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 [17 C.F.R. § 240.14e-3] thereunder.

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining defendant Prado, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rules 10b-5 [17 C.F.R. § 240.10b-5] and 14e-3 [17 C.F.R. § 240.14e-3] thereunder;

### II.

Ordering the Defendant to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the conduct alleged in this Complaint.

### III.

Ordering the Defendant to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1].

## IV.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
September 20, 2012

*Sanjay Wadhwa*
_____
Sanjay Wadhwa
Deputy Chief, Market Abuse Unit
 and Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0181
Wadhwas@sec.gov

Of Counsel:

Daniel M. Hawke (Hawked@sec.gov)*
David S. Brown (BrownDav@sec.gov)*
Megan M. Bergstrom (Bergstromm@sec.gov)*
Charles D. Riely (Rielyc@sec.gov)

* not admitted in the S.D.N.Y.