UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,  :
 :
                       Plaintiff,  :
 :
-against-  :
 :    12 Civ.    ( )
WALDYR DA SILVA PRADO NETO,  :
 :
 :
 :    ECF CASE
                       Defendant.  :
------------------------------------------------------------x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS *EX PARTE* EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, ORDER TO SHOW CAUSE, ASSET FREEZE AND OTHER RELIEF**

Sanjay Wadhwa
Daniel M. Hawke*
David S. Brown*
Megan M. Bergstrom*
Charles D. Riely

* not admitted in the S.D.N.Y.

Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
3 World Financial Center
New York, NY 10281

September 20, 2012

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND .......................................................................................................4

    A.    The Burger King Announcement and the Market Reaction ...................................4

    B.    Prado's Customer's Access to Material, Nonpublic Information .........................4

    C.    Prado's Contacts With His Customer During Nonpublic Acquisition Negotiations ..................................................................................................................................5

    D.    Prado's Trades Based on Misappropriated Information from His Customer........5

    E.    Prado Tips Tippee A and Other Customers Who Buy Burger King Securities ......6

    F.    Prado Attempts to Concoct a False Story for His Trades, Flees to His Native Brazil and Begins to Transfer His Assets Outside The United States .....................8

ARGUMENT ...............................................................................................................................10

    I.    THE COURT SHOULD ORDER THAT PRADO'S ASSETS BE FROZEN PENDING A FINAL ADJUDICATION OF THIS ACTION AND PENDING A HEARING AND DETERMINATION OF THE COMMISSION'S APPLICATION.............................................................................................................10

        A. There Is Strong Evidence of the Insider Trading Alleged in the Commission's Complaint...............................................................10

        B. An Asset Freeze Order Is Appropriate Because of the Serious Risk that All of Prado's Assets Will be Transferred Offshore. .....................................................11

    II.    A REPATRIATION ORDER IS APPROPRIATE...................................14

    III.    THE COMMISSION SATISFIES THE STANDARD FOR OBTAINING A TEMPORARY RESTRAINING ORDER AND PRELIMARY INJUNCTION..14

    IV.    AN ORDER SHOULD BE ISSUED PROHIBITING THE ALTERATION AND DESTRUCTION OF DOCUMENTS AND OTHER RECORDS...................15

CONCLUSION ............................................................................................................................16

# TABLE OF AUTHORITIES

**PAGE**

## CASES

Basic v. Levinson
   485 U.S. 224 (1988) ............................................................................................................ 11

Dirks v. SEC
   463 U.S. 646 (1983) ............................................................................................................ 11

Gonzalez de Castilla
   145 F. Supp. 2d at 420 (S.D.N.Y. 2001) ........................................................................... 13

Rolf v. Blyth, Eastman Dillon & Co.
   570 F.2d 38 (2d Cir.), cert. denied, 438 U.S. 1039 (1978) ................................................ 12

SEC v. Aimsi Technologies, Inc.
   650 F. Supp. 2d 296 (S.D.N.Y. 2009) ................................................................................ 14

SEC v. Banner Fund Int'l
   211 F.2d 602 (D.C. Cir. 2000) ............................................................................................ 14

SEC v. Bremont
   954 F. Supp. 726 (S.D.N.Y. 1997) ..................................................................................... 15

SEC v. Byers
   2009 WL 33434 (S.D.N.Y. Jan. 7, 2009) ........................................................................... 10

SEC v. Cavanagh
   155 F.3d 129 (2d Cir. 1998) ............................................................................................... 15

SEC v. Grossman
   887 F. Supp. 649 (S.D.N.Y. 1995), aff'd, 101 F.3d 109 (2d Cir. 1996) ............................. 13

SEC v. Igor Poteroba et al.
   10 Civ 2667 (S.D.N.Y. 2010) ............................................................................................. 13

SEC v. Resource Devel. Int'l LLC
   160 F. App'x 368 (5th Cir. Dec. 21, 2005) ........................................................................ 14

SEC v. Sekhri
   2002 WL 31100823 (S.D.N.Y. July 22, 2002) .................................................................. 11

SEC v. Singer
   786 F. Supp. 1158 (S.D.N.Y. 1992) .................................................................................. 12

SEC v. Sonja Anticevic et al.
   05 Civ. 6991 (S.D.N.Y. 2005) ......................................................................................... 13

SEC v. Unifund SAL
   910 F.2d 1028 (2d Cir. 1990) .................................................................................... 10, 15

SEC v. Vaskevitch
   657 F. Supp. 312 (S.D.N.Y. 1987) .................................................................................. 15

Smith v. SEC
   653 F.3d 121 (2d Cir. 2011) ...................................................................................... 10, 14

U.S. v. Chestman
   947 F.2d 551 (2d Cir. 1991) ............................................................................................ 11

U.S. v. O'Hagan
   521 U.S. 642 (1997) ........................................................................................................ 11

## FEDERAL STATUTES

**Securities Exchange Act of 1934**

Section 10(b)
   [15 U.S.C. § 78j(b)] ........................................................................................... 3, 10, 11, 14

Section 14(e)
   [15 U.S.C. § 78n(e)] ................................................................................................ 3, 11, 14

## FEDERAL REGULATIONS

Rule 10b-5
   [17 C.F.R. §240.10b-5] ..................................................................................... 3, 10, 11, 14

Rule 14e-3
   [17 C.F.R. § 240.14e-3] .................................................................................... 3, 10, 11, 14

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this Memorandum of Law in support of its *ex parte* emergency application for a temporary restraining order, preliminary injunction, order to show cause, asset freeze and other relief against defendant Waldyr Da Silva Prado Neto ("Prado").

## PRELIMINARY STATEMENT

This case involves insider trading by Prado in the securities of Burger King Holdings, Inc. ("Burger King") in advance of Burger King's September 2, 2010 announcement that it would be acquired by affiliates of 3G Capital Partners Ltd. ("3G Capital"), a New York-based private equity firm, for $24 per share (the "Announcement"). As a result of the Announcement, the closing price of Burger King's stock increased approximately 43% over its August 31 closing price and approximately 25% over its September 1 closing price.

Prado, while a registered representative at Wells Fargo Advisors, LLC ("Wells Fargo"), misappropriated material nonpublic information about the acquisition of Burger King from one of his brokerage customers (the "Customer") who invested at least $50 million in the fund (the "Fund") that 3G Capital used to acquire Burger King. Prado used this information to trade Burger King securities, and tipped at least four others, including one brokerage customer ("Tippee A") who traded Burger King securities on the basis of this information through an account he controlled. Despite being warned as early as May 17, 2010 that he should not trade Burger King stock for himself or his customers in light of the information in his possession, Prado repeatedly purchased Burger King stock between May 17, 2010 and September 1, 2010. All told, Prado, Tippee A, and three of Prado's other customers reaped total profits of over $2 million. The declarations and exhibits submitted with this application set forth the strong circumstantial evidence of the insider trading alleged in the Commission's Complaint.

The Commission brings this emergency application to prevent Prado from transferring his assets outside the jurisdiction of the United States Courts. The Commission has recently learned that Prado, a citizen of Brazil, abandoned his most recent job, put his residence up for sale, and started to transfer all of his assets outside the United States. Prado initially told his employer that he was in Brazil for a three-day business trip, but eventually admitted that he was not returning to the United States. The Commission, therefore, seeks an emergency asset freeze and related relief to preserve the *status quo* and to protect this Court's ability to enter a meaningful judgment of disgorgement, prejudgment interest and monetary penalties in this action. Accordingly, the Commission respectfully requests that the Court enter an order:

(1) Directing Defendant Prado to show cause why an order should not be entered, pending a final disposition of this action:

    (a) Freezing Prado's assets;

    (b) Ordering Prado to transfer to the registry of this Court all assets, funds, and other property held in foreign locations in the name of Prado, or for the benefit or under the direct or indirect control of him, or over which he exercises control or signatory authority;

    (c) Prohibiting Prado from destroying, altering mutilating, concealing, altering or disposing of records of any kind, including but not limited to financial records, that refer, reflect or relate to the allegations in the Complaint, or that refer, reflect or relate to Prado's assets, finances or business operations; and

(d) Preliminarily enjoining Prado from violations of Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5 and 14e-3 thereunder, as alleged in the Complaint; and

(2) Pending adjudication of the relief described in paragraph (1) above, an order:

(a) Temporarily freezing Prado's assets;

(b) Temporarily ordering Prado to transfer to the registry of this Court all assets, funds, and other property held in foreign locations in the name of Prado, or for the benefit or under the direct or indirect control of him, or over which he exercises control or signatory authority;

(c) Temporarily prohibiting Prado from destroying, mutilating, concealing, altering or disposing of records of any kind, including but not limited to financial records, that refer, reflect or relate to the allegations in the Complaint, or that refer, reflect or relate to Prado's assets, finances or business operations; and

(d) Temporarily restraining Defendant Prado from violations of Sections 10(b) and 14(e) of the Exchange Act and Rules 10b-5 and 14e-3 thereunder, as alleged in the Complaint filed by the Commission on September 20, 2012.

## FACTUAL BACKGROUND

### A. The Burger King Announcement and the Market Reaction

On September 2, 2010, before the opening of trading, Burger King and 3G Capital issued a joint press release announcing that they had entered into a definitive agreement under which affiliates of 3G Capital would acquire Burger King stock at $24 per share, or $4 billion, including the assumption of the company's outstanding debt. The offer price represented a 46% premium to Burger King's share price on August 31, 2010. (Brown ¶ 4 & Ex. 1.)[1] This Announcement was the result of months of nonpublic negotiations between Burger King and 3G Capital. Between March 29, 2010, the date of 3G Capital's first offer, and August 31, 2010, Burger King's stock traded between a low of $16.41 and a high of $22.06. (Id. ¶ 4.)

### B. Prado's Customer's Access to Material, Nonpublic Information

The Customer obtained periodic updates concerning these ongoing nonpublic negotiations from at least March 2010 to the Announcement on September 2, 2010. On March 14, 2010, the Customer signed a confidentiality agreement with 3G Capital. (Id. ¶ 6.) After signing the agreement, a 3G Capital partner informed the Customer that Burger King was the potential target of the acquisition. (Id.) The Customer committed to invest at least $50 million in a 3G Capital fund individually and/or through entities he controlled. (Id. ¶ 7.) After signing the confidentiality agreement in March 2010, the Customer was periodically informed about the status and progress of the Burger King acquisition by certain 3G Capital partners. (Id. ¶ 6.) The Customer who invested in the Fund has been a brokerage customer of Prado's for over ten-years

---

[1] Citations to "Brown Decl. ¶ ___" and "Brown Ex. ___" refer to the Declaration of David S. Brown in Support of Commission's *Ex Parte* Emergency Application for a Temporary Restraining Order, Preliminary Injunction, Order to Show Cause, Asset Freeze and Other Relief against defendant Waldyr Da Silva Prado Neto, executed on September 20, 2012, and to exhibits thereto.

4

and the Customer had a history of sharing confidential, financial information with Prado. (Id.) After the Announcement on September 2, 2010, the Customer satisfied his commitment to invest in the Fund by transferring at least $50 million to a Wells Fargo brokerage account for which Prado was the registered representative. (Brown ¶ 7.) These funds were then transferred to a 3G Capital account. (Id.)

**C.     Prado's Contacts With His Customer During Nonpublic Acquisition Negotiations**

During the time that the Customer had access to material, nonpublic information, the Customer had numerous communications with Prado. Specifically, between March 14, 2010 and September 2, 2010, Prado communicated with the Customer or professionals working for the Customer in person, by e-mail, and over the phone. (Brown ¶ 6 and Ex. 2.) Prado traveled from Miami to Brazil in May and August 2010, and during each of these visits made brief separate trips to the Brazilian town in which the Customer resides. (Brown ¶¶ 6, 8, and 11.)

**D.     Prado's Trades Based on Misappropriated Information from His Customer**

Based on the material nonpublic information Prado learned and misappropriated from the Customer, Prado purchased Burger King stock and/or call options in May, June, August and September 2010. Prado began trading in Burger King securities on May 17, 2010 during one of his trips to Brazil. That day, he purchased 300 Burger King call options with an expiration date in July 2010 and a strike price of $20.[2] (Id. ¶ 13 and Ex. 10.)

Prado's May 17 trading in Burger King was prompted by information he learned during his trip to Brazil. The evening of May 17, 2010, Prado sent an e-mail written in Portuguese to a friend in Miami who runs a hedge fund. (Id. ¶ 8.) Prado's email stated (translated from the

---

[2] A "call option" is an option contract that gives the buyer the right, but not the obligation, to purchase a company's stock at a set price (the "strike price") for a certain period of time (through "expiration"). In general, one buys a call option, or call, when the stock price is expected to rise, or sells a call when the stock price is expected to fall.

5

original Portuguese): "I'm in Brazil with information that cannot be sent by email. You can't miss it." (Id. ¶ 8 and Ex. 3.) After receiving the e-mail, Prado's friend called him and the two had a call during which Prado told him that he heard that 3G Capital was going to take Burger King private. That friend has submitted a declaration saying:

> During our phone conversation, *Prado told me on May 17, 2010 that he had information that Burger King was going to be taken private by a company called 3G*. Prado did not say how he knew that. *I told Prado that, if the information that 3G was going to take Burger King private was true, Prado should not trade on that information and that Prado's clients should not trade on that information.*

(Declaration of Marcelo P. Lima dated September 19, 2012) ("Lima Decl.") (emphasis added.)

The May 17, 2010 purchases were Prado's first purchases of Burger King securities. (Brown Decl. ¶ 16 and Ex. 11). After May 17, 2010, and despite his friend's warning that he not trade in Burger King, Prado continued to purchase Burger King securities as follows: (a) June 3, 2010: 7,000 shares of Burger King stock; (b) August 25, 2010: 13,000 shares of Burger King stock; (c) August 25, 2010: 100 Burger King call options with a strike price of $20 and an expiration date of January 2011; and (d) September 1, 2010: 9,000 shares of Burger King stock. Prado sold all of his Burger King securities on the date of the Announcement for total profits of over $175,000. (Id. ¶ 13 and Ex. 10.)

### E. Prado Tips Tippee A and Other Customers Who Buy Burger King Securities

The sequence and pattern of contacts and trading demonstrates that Prado not only traded on the basis of the material nonpublic information that he misappropriated from the Customer, but that he also tipped another customer of his, Tippee A, who traded on the information. Tippee A has been a customer of Prado's since 2008. Prado described Tippee A as a "big client" and recognized that it was important to show "this big client you have potential investment ideas in order to make a commission and have a better life." (Brown Ex. 11 at 92-93). On May 17, 2010, minutes after Prado sent the e-mail to his friend in Miami who runs the hedge fund, he sent

6

a similar e-mail to Tippee A. (Brown ¶ 9 and Ex. 5.) The email stated (translated from the original Portuguese): "[I]f you are around call me at the ... hotel...I have some info that I cannot say over phone. You have to hear this." (Id.) After receiving the e-mail on May 17, Tippee A called Prado at his hotel and the two had an approximately 10 minute phone conversation. (Id. ¶ 9 and Ex. 6.) This conversation occurred on the same day that Prado told his Miami friend he had heard that 3G Capital was going to take Burger King private.

The day after receiving Prado's May 17 e-mail and the phone call with Prado, Tippee A began trading Burger King call options. In particular, on May 18 and May 19, 2010, Tippee A purchased 2,850 Burger King call options with a July 2010 expiration date and a strike price of $22.5 through accounts he controlled in the name of Tipper A's entity. (Id. ¶ 14.) Tippee A continued to purchase Burger King call options in June 2010. Between June 2, 2010 and June 17, 2010, Tippee A purchased 2,000 Burger King call options with a July 2010 expiration date and a strike price of $20. (Id.)

Prado remained in frequent contact with Tippee A in the months leading up to the Announcement. (Brown ¶ 10 and Ex. 7.) Between May 2010 and September 2, 2010, Prado and Tippee A communicated by phone at least 23 times. (Id.) On August 18, 2010, while Prado was in the area of Brazil where the Customer lives and on a day when phone records show that Prado called the Customer's assistant, Tippee A sent Prado an email asking (translated from the original Portuguese): "Is the sandwich deal going to happen?" Prado responded: "Yes it's going to happen." (Brown ¶ 11 and Ex. 8.) That same day Tippee A sent Prado another email asking whether the "sandwich deal" was going to happen and Prado responded (translated from the original Portuguese): "[e]verything is 100% under control." (Id.)

7

Despite previously losing money on July 2010 call options, Tippee A began purchasing Burger King call options again on August 19, 2010 – the day after his emails with Prado regarding the "sandwich deal." (Id. ¶ 14.)  In particular, on August 19, Tippee A purchased 1,400 Burger King October call options with a strike price of $17.50 and 206 Burger King October call options with a strike price of $19.  Tippee A also purchased an additional 1,794 Burger King October call options with a strike price of $19 on August 26 and August 27, 2010. (Id.)

On September 2, 2010 Tippee A emailed Prado, after news of the Burger King acquisition became public, and asked (translated from the original Portuguese) if there was "[a]ny news about price they will pay for sandwich?" (Id. ¶ 12 and Ex. 9.)  In response to an email from Prado about the price per share information, Tippee A wrote in English: "Wow! What a day!" (Id.)

Finally, Prado also tipped other customers aside from Tippee A.  Specifically, between May 17, 2010 and August 26, 2010, at least three additional customers of Prado's traded Burger King stock and/or call options reaping total profits of nearly $220,000. (Id. ¶ 15.)

F. **Prado Attempts to Concoct a False Story for His Trades, Flees to His Native Brazil and Begins to Transfer His Assets Outside The United States**

Prado's recent actions reflect his culpability and highlight the need for emergency relief. First, Prado has attempted to concoct an after-the-fact false story justifying his Burger King trades. On August 10, 2012, Prado met with the Miami friend who runs a hedge fund and who had warned Prado on May 17, 2010 against trading Burger King securities. (Lima Decl.) During the August 10, 2012 meeting, after Prado presented an article to the friend and suggested an alternative reason for his trades, the friend became uncomfortable with Prado's statements and left. (Id.)

8

Second, Prado has now fled to his native Brazil. Prado traveled to Brazil on August 13, 2012 for a previously scheduled three-day business trip. (Id. ¶ 19.) For approximately the next two weeks, Prado led his co-workers to believe that he would be returning to the U.S. and had been delayed because his mother was ill. (Id.) Eventually, on September 13, 2012, Prado told his employer the truth — that he did not plan on returning to the U.S. When asked by a representative of his employer "Do you plan on returning to the United States," Prado answered "No, I'm not." (Id. 19, 20.)

Third, having reaped the profits from his trading in Burger King securities and to avoid having to relinquish them, Prado has taken several steps to liquidate his assets and transfer them out of the U.S. Prado initiated the liquidation of his 401(k) retirement plan held at Wells Fargo Advisors on September 7, 2012 and was issued a distribution check of $130,292.53 on September 11, 2012, which remained outstanding as of 3:00 p.m. (EST) on September 18, 2012. (Id. ¶ 24.) In August and September 2012, Prado liquidated at least $1.6 million in securities held in his brokerage accounts at Morgan Stanley, and he transferred at least $1.5 million in cash from those accounts including making wire transfers to a bank account in Brazil. (Id. ¶¶ 21-22.) On September 12, 2012, Prado attempted to wire transfer $490,000 in cash from his Morgan Stanley brokerage account to a bank account in Brazil. (Id. 19 and Ex. 13.) On September 3, 2012 Prado signed a listing agreement to sell his condominium for $1 million and an offer to purchase the condo for $810,000 was made on September 11, 2012. (Id. ¶ 25 and Exs. 16 and 17.)

9

**ARGUMENT**

**I.**

**THE COURT SHOULD ORDER THAT PRADO'S ASSETS BE FROZEN PENDING A FINAL ADJUDICATION OF THIS ACTION AND PENDING A HEARING AND DETERMINATION OF THE COMMISSION'S APPLICATION**

"An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." SEC v. Byers, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009). To obtain an asset freeze, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." Smith v. SEC, 653 F.3d 121, 128 (2d Cir. 2011). As emphasized by the Second Circuit in SEC v. Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990), "the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged." Accordingly, the Commission's burden of proof on an asset freeze application is substantially lower than its burden of proof on an application for a preliminary injunction against future securities laws violations. See, e.g., id. (denying preliminary injunction, but granting asset freeze application).

Here, the Commission has met the evidentiary standard for an asset freeze because it has presented evidence that Prado misappropriated information from an insider and used that information to make over $2 million cumulative in illicit trading profits to him personally and his tippees. An emergency asset freeze is appropriate because of the serious risks that Prado will transfers his assets outside of the United States.

### A.    There Is Strong Evidence of the Insider Trading Alleged in the Commission's Complaint.

A person is liable under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder for illegal insider trading when he obtains material, nonpublic information intended to be used only for a proper purpose and then misappropriates or otherwise misuses that information in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits" by trading or tipping others. Dirks v. SEC, 463 U.S. 646, 654 (1983). A person is liable under Section 14(e) of the Exchange Act and Rule 14e-3 when he trades on the basis of material nonpublic information concerning a pending tender offer that the trader knows or has reason to know has been acquired directly or indirectly from an insider of the offeror or issuer, or someone working on their behalf. U.S. v. O'Hagan, 521 U.S. 642, 669 (1997).[3]

As is evident from the dramatic spike in Burger King's stock price immediately following the Announcement, the information about Burger King's acquisition by 3G Capital was nonpublic and material. See SEC v. Sekhri, 2002 WL 31100823, at *13 (S.D.N.Y. July 22, 2002); see also Basic v. Levinson, 485 U.S. 224, 231-32 (1988). Moreover, the Commission has presented ample evidence demonstrating that Prado illegally traded while in possession of material, nonpublic information about 3G Capital's impending acquisition of Burger King and also tipped Tippee A. First, after having never previously invested in Burger King securities, Prado made a series of transactions in Burger King securities between May 17, 2010 and the day before the Announcement, September 1, 2010. Prado, in fact, made his first purchase of Burger King securities on May 17 – while in Brazil meeting with customers. Tellingly, on this same day, Prado had a conversation with a friend and told him directly that Prado heard 3G Capital

---

[3] Unlike the insider trading prohibitions of Section 10(b) and Rule 10b-5, Section 14(e) and Rule 14e-3 impose an obligation to "disclose or abstain" from trading or tipping regardless of whether an individual owes a fiduciary duty to respect the confidentiality of the information. See U.S. v. Chestman, 947 F.2d 551, 557-560 (2d Cir. 1991). Here, as detailed above, the Commission makes a sufficient showing under both Section 10(b) and Section 14(e).

11

was going to take Burger King private. (Lima Decl.) Prado also tipped Tippee A who, like Prado, subsequently invested in Burger King securities between May and August, including trades just the week prior to the Announcement.

The fact that these purchases were based on material, nonpublic information – and *not* Prado's stock research – is underscored by documentary evidence showing that Prado himself considered the information highly confidential. On the evening of May 17, 2010, Prado sent an e-mail written in Portuguese to a friend in Miami stating: "I'm in Brazil with information that cannot be sent by email. You can't miss it…." Minutes later, he sent a similar e-mail to Tippee A, saying: "[I]f you are around call me at the . . . hotel…I have some info…You have to hear this." Later, in August of 2010, Prado and Tippee A communicated concerning the impending acquisition in coded emails. Tippee A sent Prado two emails regarding the "sandwich deal", and each time, Prado assured him the deal was going forward, even stating "yes, it's going to happen" and "everything is 100% under control."

Taken together, the evidence of Prado's May 17 emails to Tippee A and his Miami friend, his May 17 conversation with his Miami friend, the August 18 emails to Tippee A, and the trading done by Prado, Tippee A, and other Prado customers demonstrate that Prado had access to specific deal information. See, e.g., SEC v. Singer, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992) ("[p]roof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession")

Finally, this evidence also shows that Prado acted with the requisite scienter. It is well established that one who trades in securities while in possession of information that he knows or has reason to know is confidential and was improperly obtained, or who trades in reckless disregard of these facts, acts with scienter. See, e.g., Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44-46

12

(2d Cir.), cert. denied, 438 U.S. 1039 (1978). Here, Prado was entrusted with the Customer's highly confidential personal investment information in connection with his work as Customer's stock broker. Instead of using this information solely to serve his customer, he misappropriated it to make illicit profits for himself and other select tippees. Moreover, Prado was explicitly warned on May 17, 2010 not to trade in Burger King securities for himself or his customers in light of Prado's possession of the information regarding 3G Capital and Burger King. Nevertheless, Prado purchased Burger King stock repeatedly from May 17, 2010 through September 1, 2010, and continued to tip other customers.

The evidence in this case is similar to other insider trading cases where the Commission has sought and obtained preliminary asset freeze orders based on circumstantial evidence of illegal insider trading. See SEC v. Igor Poteroba et al., 10 Civ 2667 (S.D.N.Y. 2010)(Docket Entry No. 2)(ordering that, among other things, froze assets of certain defendants); SEC v. Sonja Anticevic et al., 05 Civ. 6991 (S.D.N.Y. 2005)(Docket Entry Nos. 3 and 20) (entering orders on August 5, 2005 and August 18, 2005 that, among other things, froze assets of certain defendants).

**B.      An Asset Freeze Order Is Appropriate Because of the Serious Risk that All of Prado's Assets Will Be Transferred Offshore.**

An asset freeze is particularly appropriate here given the clear risk of imminent asset dissipation. See, e.g., Gonzalez de Castilla, 145 F. Supp. 2d at 420 (S.D.N.Y. 2001). Already, Prado has abandoned his job in Miami, placed his condo up for sale, and taken steps to liquidate and transfer other assets outside of the U.S. A freeze is necessary to preserve funds that may be necessary to satisfy final judgments for disgorgement or civil penalties. See, e.g., SEC v. Grossman, 887 F. Supp. 649, 661 (S.D.N.Y. 1995) ("[i]t is irrelevant whether the funds affected by the Assets Freeze are traceable to the illegal activity"), aff'd, 101 F.3d 109 (2d Cir. 1996).

13

Absent an asset freeze from this Court, Prado will transfer the assets outside the jurisdiction of this Court and the Commission's ability to obtain disgorgement and penalties will be lost.

## II.

## A REPATRIATION ORDER IS APPROPRIATE

The Commission also seeks a repatriation order requiring Prado to return to identified accounts in the United States all illicit profits that may be located outside this Court's jurisdiction. Courts frequently enter repatriation orders when they order assets frozen if there is evidence that assets may be held abroad. E.g., SEC v. Resource Devel. Int'l LLC, 160 F. App'x 368 (5th Cir. Dec. 21, 2005) (affirming asset freeze and repatriation order); SEC v. Banner Fund Int'l, 211 F.2d 602 (D.C. Cir. 2000); SEC v. Aimsi Technologies, Inc., 650 F. Supp. 2d 296 (S.D.N.Y. 2009). Such an order is appropriate here. Prado is a Brazilian citizen who told his employer that he intends to remain there and has made recent attempts to transfer funds outside of the U.S.

## III.

## THE COMMISSION SATISFIES THE STANDARD FOR OBTAINING A TEMPORARY RESTRAINING ORDER AND PRELIMANY INJUNCTION

A temporary restraining order and preliminary injunction against Prado preventing future violations of the federal securities laws are appropriate. The Commission need not show irreparable injury or the unavailability of other remedies. Smith, 653 F.3d at 127-128 (internal citations omitted). Instead, "the SEC need only make a substantial showing of likelihood of success as to both the current violation and the risk of repetition." Id. (internal citations and quotations omitted).

Here, the Commission meets this standard. First, for the reasons discussed above, the Commission has made a substantial showing that Prado traded Burger King securities on the basis of material, nonpublic information in violation of Sections 10(b) and 14(e) of the Exchange

14

## **CONCLUSION**

For all the foregoing reasons, the Commission requests that this application be granted.

Dated: New York, New York
September 20, 2012

Charles D. Riely
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0535

Of Counsel:

Sanjay Wadhwa
Daniel M. Hawke (Hawked@sec.gov)*
David S. Brown (BrownDav@sec.gov)*
Megan M. Bergstrom (Bergstromm@sec.gov)*

* not admitted in the S.D.N.Y.