UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,       :
                             Plaintiff,       :
        -against-       :
                                :       12 Civ.       (   )
WALDYR DA SILVA PRADO NETO,       :
                                :       ECF Case
                       Defendant.       :
-------------------------------------------------------------x

## DECLARATION OF DAVID S. BROWN IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, <u>ORDER TO SHOW CAUSE, ASSET FREEZE AND OTHER RELIEF</u>

I, David S. Brown, declare, pursuant to 28 U.S.C. § 1746, as follows:

    1.     I am an attorney admitted to practice law by the State Bar of California. I am employed by Plaintiff Securities and Exchange Commission (the "Commission") as a staff attorney in the Division of Enforcement, Market Abuse Unit, in the Commission's Los Angeles Regional Office and am one of the Commission's counsel of record in this litigation. I have personal knowledge of each of the matters set forth below based on the files and records the Commission has obtained in this investigation. I make this declaration in support of the Commission's *Ex Parte* Emergency Application for a Temporary Restraining Order, Preliminary Injunction, Order to Show Cause, Asset Freeze and Other Relief against Defendant Waldyr Da Silva Prado Neto ("Prado").

### Background of Defendant Prado

2. Prado is a Brazilian citizen and has an L-1B visa that allows him to work in the United States for a limited period. Prado holds Series 7, 53, 63, and 65 securities licenses. Prado was employed as a registered representative of Wells Fargo Advisors, LLC ("Wells Fargo Advisors") or its predecessor entities from 1999 through May 2012. In May 2012, Prado left Wells Fargo Advisors to become a registered representative at Morgan Stanley Smith Barney ("Morgan Stanley"), where he worked until he was terminated on September 13, 2012.

### The Securities At Issue: Securities of Burger King Holdings, Inc.

3. Burger King Holdings, Inc. is a Delaware corporation headquartered in Miami, Florida. Until October 2010, Burger King's common stock was listed on the New York Stock Exchange under the symbol BKC and its options traded on various exchanges including the Chicago Board Options Exchange.

### The 2010 Announcement of Burger King's Acquisition

4. On September 2, 2010, before the opening of trading, Burger King and 3G Capital Ltd. ("3G Capital") issued a joint press release announcing that they had entered into an agreement under which affiliates of 3G Capital would acquire the outstanding Burger King stock at $24 per share, or $4 billion, including the assumption of the company's outstanding debt, a true and correct copy of which is attached hereto as Exhibit 1. The offer price represented a 46% premium to Burger King's share price on August 31, 2010. Between March 29, 2010, the date of 3G Capital's first offer, and August 31, 2010, Burger King's stock traded between a low of $16.41 and a high of $22.06 on average volume of 1,597,926.

**Suspicious Trading of Burger King Securities**

5. The Commission alleges in the Complaint filed in this action that Prado, while employed as a registered representative of Wells Fargo Advisors, misappropriated information entrusted to him by one of his brokerage customers (the "Customer") that 3G Capital planned to acquire Burger King and take it private.

6. The Customer signed a confidentiality agreement with 3G Capital on March 14, 2010 relating to the Burger King acquisition. Around the time the Customer signed the confidentiality agreement, he was told by 3G Capital that Burger King was the target of the acquisition and thereafter he received periodic updates about the progress of the deal from 3G Capital's representatives. The Customer who committed to investing in the 3G Capital fund ("Fund") that was used to acquire Burger King has been a brokerage customer of Prado's for the past ten years or so. As part of this 10-year relationship, the Customer had a history of sharing confidential, financial information with Prado. Prado understood that, as a registered representative, he was expected to maintain the confidentiality of customer information. Between March 14, 2010 and September 2, 2010, Prado communicated with the Customer and/or his professionals in person, by email, and over the phone. True and correct copies of excerpts of Prado's phone records that show these communications are attached hereto as Exhibit 2. In May 2010, Prado prepared internal Wells Fargo Advisors due diligence documents for an account that the Customer had opened at Wells Fargo Advisers.

7. After the announcement of the acquisition on September 2, 2010, the Customer satisfied his commitment to 3G Capital by transferring at least $50 million to the account he opened at Wells Fargo Advisors for which Prado was the registered representative, which was then transferred to a 3G Capital account.

8. Prado began trading Burger King securities on May 17, 2010 when he was in the same region of Brazil as the Customer. The night of his trades, Prado sent an email to a friend of his who runs a Miami-based hedge fund, which stated (translated from the original Portuguese): "I'm in Brazil with information that cannot be sent by email. You can't miss it." Attached hereto as Exhibit 3 is a true and correct copy of that email, which was produced by Wells Fargo Advisors. Prado's friend called him after receiving the email and they spoke for 17 minutes and 54 seconds. A true and correct excerpt of Prado's phone records showing this call is attached hereto as Exhibit 4. Prado's friend has submitted a declaration to the Commission outlining his communications with Prado on May 17, 2010 that is being filed concurrently with this declaration (See Declaration of Marcelo P. Lima).

9. Minutes after Prado emailed the friend he sent a similar email to one of his customers, Tippee A, which stated (translated from the original Portuguese): "[i]f you are around call me at the...hotel...I have some info that I cannot say over phone. You have to hear this." Attached hereto as Exhibit 5 is a true and correct copy of that May 17, 2010 email, which was produced by Wells Fargo Advisors. Tippee A and Prado also communicated by phone on May 17. A true and correct copy of an excerpt of a phone record produced by Tippee A showing this communication is attached hereto as Exhibit 6.

10. Between May 2010 and September 2, 2010, Prado and Tippee A communicated by phone and email at least 23 times. Attached hereto as Exhibit 7 is an excerpt of phone records produced by Wells Fargo Advisors showing calls between numbers associated with Prado and Tippee A.

11. In August 2010 Prado communicated with the Customer and/or his professionals in person, by email, and over the phone. During this time, Prado was also in communication

4

with Tippee A. While Prado was in the area of Brazil where the Customer lives, Tippee A sent Prado an email on August 18, 2010 asking (translated from the original Portuguese): "Is the sandwich deal going to happen?" Prado responded "Yes it's going to happen." That same day Tippee A sent Prado another email asking whether the "sandwich deal" was going to happen and Prado responded (translated from the original Portuguese) "[e]verything is 100% under control. I was embarrassed to ask about timing. The last 'vol' got in the way." Attached hereto as Exhibit 8 are true and correct copies of the August 18, 2010 emails produced by Wells Fargo Advisors. In these emails Prado references that he is in Brazil. Prado's phone records show that he communicated with the Customer's assistant on August 17 and 18, 2010, true and correct excerpted copies of which are attached hereto as Exhibit 2.

12. On September 2, 2010 Tippee A emailed Prado, after news of the Burger King acquisition became public, and asked (translated from the original Portuguese) if there was "[a]ny news about price they will pay for sandwich?" In response to an email from Prado about the price per share information, Tippee A wrote in English "Wow! What a day!" Attached hereto as Exhibit 9 are true and correct copies of the September 2, 2010 emails, which Wells Fargo Advisors produced.

13. Between May 17, 2010 and September 1, 2010 Prado purchased Burger King securities as follows: 300 July $20 call options (a portion of which Prado sold for a loss and a portion of which expired worthless), 100 January $20 call options, and 29,000 shares of common stock. I calculated that Prado's total profits from trading Burger King securities were $177,791.98 (not including commissions or the loss on the July options). Attached collectively hereto as Exhibit 10 are true and correct copies of portions of Prado's monthly account

statements which show his trading in Burger King securities through his account at Wells Fargo Advisors.

14. Between May 18, 2010 and August 27, 2010 Tippee A, through his entity, purchased Burger King securities as follows: 2,000 July $20 call options (expired worthless); 2,850 July $22.5 call options (expired worthless); 1,400 October $17.5 call options; and 2,000 October $19 call options. I calculated that Tippee A's total profits trading Burger King securities were $1,681,090 (not including commissions or the loss on the expired options).

15. In addition to Tippee A, Prado gave at least three other customers material nonpublic information regarding the Burger King acquisition who traded Burger King securities before the September 2, 2010 announcement and made $219,918.31 in profits.

16. The Commission staff took the testimony of Prado under oath on July 12, 2012, true and correct copies of portions of his testimony are attached hereto as Exhibit 11, which includes Prado's statement denying he traded Burger King securities before May 17, 2010.

**Prado's Recent Termination by Morgan Stanley and Attempt to Move Money**

17. On September 13, 2012, I spoke by telephone with an attorney in the Morgan Stanley Legal and Compliance Division, Timothy Atkins ("Atkins"), who advised that: (1) Prado had been fired from Morgan Stanley, (2) Prado had fled the country, (3) Prado had been selling securities in and trying to move money from his Morgan Stanley accounts, and (4) that money remained in those accounts. Atkins sent my office an email on September 13, 2012 which set forth the balances in Prado's two accounts, totaling $1,468,407, a true and correct copy of which is attached hereto as Exhibit 12.

18. On September 14, 2012, I spoke by telephone with Prado's supervisor at Morgan Stanley, Kevin McCarty ("McCarty"), and Atkins. McCarty told me that about six weeks ago

6

Prado sought McCarty's consent for a transfer of about $100,000 from his Morgan Stanley account to Wells Fargo Advisors to repay the remaining portion of the retention bonus Prado received from Wells Fargo Advisors while he was employed there.

19. On September 14, 2012 McCarty told me that Prado had been approved to travel to Brazil on Morgan Stanley business between August 13 and 16, 2012. McCarty told me that in late August 2012 he received an email in Portuguese that Prado's mother was very ill. McCarty told me that on September 12, 2012 he was notified that Prado requested a wire transfer of $490,000 from his Morgan Stanley account, a true and correct copy of which is attached hereto as Exhibit 13. McCarty told me that he tried calling Prado several times on September 12, 2012 and was unable to reach Prado until Prado called him on at about 4:00 p.m. (EST), at which time Prado told McCarty that although his mother was sick, she was not that ill that he needed to remain in Brazil. McCarty told me he asked Prado "Do you plan on returning to the United States?" and Prado answered "No, I'm not." McCarty told me that Prado said that the United States does not have an extradition treaty with Brazil.

20. On September 14, 2012 McCarty told me he spoke again with Prado by telephone on September 13, 2012 at about 4:00 p.m. (EST). McCarty told me that Prado said he was in Brazil. McCarty told me that Prado was advised that Morgan Stanley had terminated him for abandonment of his job and that Prado owed Morgan Stanley $1.4 million for the signing and retention bonus. McCarty told me that Prado said he took a distribution from his 401(k) at Wells Fargo Advisors and that he had a check of those funds in a desk drawer. McCarty told me that Prado said he was selling his condo in Miami and he would use the sale proceeds to repay Morgan Stanley the $490,000 that was the subject of the wire transfer instructions Prado submitted. McCarty told me that he told Prado that the Morgan Stanley bonus account had been "red flagged" and Prado was no longer able

7

to access those funds. McCarty told me he asked Prado for his address and Prado said he did not have one.

### Prado's Recent Sales in His Securities Portfolio and Outgoing Transfers

21. Morgan Stanley produced the August 2012 monthly statement and wire transfer instructions for Prado's Morgan Stanley account no. xxx-xxx292, which show that between August 2 and 20, 2012 Prado transferred $625,950 from that account, including $15,000 to an account in his name at Wells Fargo, $57,000 to a bank in New York City for "re-modeling of house payment," and $530,000 to Prado's account at Banco Paulista in Sao Paulo, Brazil. Morgan Stanley also produced a trade blotter showing account activity in this account in September 2012, which showed $1,658,478 in sales of securities between September 4 and 11, 2012. Attached collectively hereto as Exhibit 14 are true and correct copies of account documents, transfer instructions, and relevant portions of the trade blotter for Prado's Morgan Stanley account no. xxx-xxx292.

22. Morgan Stanley produced the monthly account statement for August 2012 for Prado's Morgan Stanley account no. xxx-xx0362, which shows that Prado started selling securities in that account between August 7 and 24, 2012, including selling several securities at a net loss, and that Prado transferred $906,223 from that account in August. Morgan Stanley also produced a trade blotter showing account activity in this account in September 2012, which showed a $96,000 transfer from this account to account no. xxx-xxx292. Morgan Stanley also produced recent wire transfer instructions from Prado for that account. Attached collectively hereto as Exhibit 15 are true and correct copies of account documents, transfer instructions, and relevant portions of the trade blotter for Prado's Morgan Stanley account no. xxx-xxx362.

23. Morgan Stanley advised my office on September 14, 2012 that the balance in account no. xxx-xxx292 was transferred to a Morgan Stanley firm account that day.

### Prado's Recent Liquidation of His Retirement Plan Account

24. I obtained information that Prado has a 401(k) retirement plan account at Wells Fargo Advisors. I was advised on September 18, 2012 by Philip Toben, Senior Counsel, of the Wells Fargo Legal Department, that on September 6, 2012 a request was submitted to the 401(k) plan administrator on behalf of Prado to place an order to sell all assets in his 401(k) and to request a distribution of all funds in the account. I was advised that on September 7, 2012, the plan assets were sold and the cash balance was $162,431.74. I was advised that on September 11, 2012, check number 537815895 in the net amount of $130,292.53 ($32,139.21 in federal taxes were withheld) was issued by Wells Fargo Institutional Retirement, Wells Fargo Bank NA, to Prado and the check was mailed to Prado's address of record on Aqua Avenue in Miami, Florida. I was advised that as of 3:00 p.m. (EST) on September 18, 2012, the check remained outstanding and it had not cleared the account of the issuer.

### Prado's Recent Listing to Sell His Real Property

25. Since July 2010, Prado has owned a condominium at xxx Aqua Avenue, Unit 703, Miami Beach, Florida. I issued a subpoena to Arch Realty, Inc. for documents relating to the sale of that property and it produced documents showing that on September 3, 2012 Prado signed a listing agreement to sell the property, a true and correct copy of which is attached hereto as Exhibit 16. Arch Realty also produced documents which show that on September 11, 2012 an offer of $810,000 was made on the property, Prado countered at $830,000, and that Prado told his realtor he was no longer in the United States, true and correct copies of which are collectively attached hereto as Exhibit 17.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: New York, New York
September 20, 2012

_____
David S. Brown