EXHIBIT 11

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

COPY

In the Matter of:        )
                         )   File No. LA-03898-A
BURGER KING HOLDINGS, INC.   )

WITNESS:   Waldyr da Silva Prado Neto
PAGES:     1 through 224
PLACE:     Securities and Exchange Commission
           Los Angeles Regional Office
           5760 Wilshire Boulevard
           11th Floor
           Los Angeles, California 90036-3648
DATE:      Thursday, July 12, 2012

   This above-entitled matter came on for hearing, pursuant to subpoena, at 9:40 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 1

Page 2

1  APPEARANCES:

2

3  On behalf of the Securities and Exchange Commission:

4      DAVID BROWN, ESQ.

5      Securities and Exchange Commission

6      Los Angeles Regional Office

7      5670 Wilshire Boulevard, Eleventh Floor

8      Los Angeles, California 90036

9      (323) 965-3847

10

11 On behalf of the Witness:

12     STEPHEN YOUNG, ESQ.

13     Law Offices of Keesal, Young & Logan

14     400 Oceangate

15     Post Office Box 1730

16     Long Beach, California 90801

17     (562) 436-2000

18

19

20

21

22

23

24

25

Page 5

1       P R O C E E D I N G S
2       MR. BROWN: We are on the record at 9:40 a.m. on
3   July 12, 2012.
4       May I ask you to raise your right hand, please?
5       THE WITNESS: (Witness complies.)
6       MR. BROWN: Do you swear or affirm to tell the
7   truth, the whole truth, and nothing but the truth?
8       THE WITNESS: Yes.
9   Whereupon,
10                  WALDYR DA SILVA PRADO NETO
11  was called as a witness and, having been first duly sworn, was
12  examined and testified as follows:
13                          EXAMINATION
14      BY MR. BROWN:
15      Q   Could you please state and spell your full name.
16      A   Waldyr da Silva Prado Neto.
17      Q   And can I ask you to spell that for the reporter.
18  You can put your hand down also.
19      A   W-a-l-d-y-r, space; d-a, space; S-i-l-v-a, space;
20  P-r-a-d-o, space; N-e-t-o.
21      Q   Thank you.
22          And you go by "Prado" as your last name?
23      A   Yes, it is.
24      Q   Mr. Prado, my name is David Brown, and I am an
25  officer of the Securities and Exchange Commission for the

Page 81

1   else mentioned the rumors or speculation about Burger King
2   being acquired in May 2010.
3       A   I don't remember any specific.
4       Q   Keep going.  Look through the whole Exhibit 226.
5       A   I don't remember.
6       Q   Okay.  So you went through Exhibit 226.  And in
7   looking at your contact list, that doesn't refresh your
8   memory of any of the people on that list telling you in May
9   2010 about the rumor Burger King was going to be acquired;
10  is that correct?
11      A   Yes.
12      Q   Had you ever traded Burger King securities before
13  you bought options in Burger King in May 2010?
14      A   No.
15      Q   Had you ever traded an American fast food company
16  before you bought Burger King options in May 2010?
17      A   American food company?  I don't think so.
18      Q   REDACTED  is someone you mentioned earlier.
19  He is on your contact list, Exhibit 226.
20          Who is he?
21      A   He's a client of mine.
22      Q   Client of yours at -- while you were at Wells
23  Fargo?
24      A   Yes.
25      Q   Is he still a client of yours at Morgan Stanley?

1    A    I'm sorry. I wouldn't -- It's because I wouldn't
2  tell any other client another -- that another client is
3  client of mine. So if you ask me -- let's suppose Steve was
4  a client of mine and something about Steve. I would say no.
5    **Q    Why wouldn't you do that?**
6    A    Because of -- I don't -- I think it's against
7  confidentiality. You're telling me about other clients to
8  other clients. I don't -- what I do with the client
9  Mr. Maria -- I don't do -- I don't tell Mr. Jones what Maria
10 is doing. If she's wiring the money or if she's buying IBM.
11 I never -- would never tell. It doesn't make any sense to
12 myself.
13   **Q    Why wouldn't you do that? Why is that not okay to**
14 **do?**
15   A    I think confidentiality is really important. In
16 my point of view, it's really important. I wouldn't tell
17 anybody what another client is doing. It doesn't make sense
18 at all.
19   **Q    Well, let me give you the question I was going to**
20 **ask you.**
21   A    I'm sorry.
22   **Q    And then you can say no.**
23   A    Really sorry.
24   **Q    That's okay.**                    REDACTED
25       Did you tell Mr. Cornelsen that          had

1   told you that you should have money available to make an
2   investment?
3       A    No.
                                              REDACTED
4       Q    Did you tell Mr. Cornelsen that              had
5   said about himself that he needed to have some money
6   available for an investment in 2010?
7       A    No.
8       Q    Do you have any reason to believe why
9   Mr. Cornelsen would say that?
10      A    I have no idea.  But for sure I don't tell what
11  client A is doing for the client B.  The client is buying or
12  selling, no.
13      Q    You would never do that?
14      A    No.  It's against all my habits.
15      Q    How do you know Mr. Cornelsen?
16      A    It's an interesting history.  He was on my
17  prospect list always because of he is a big name in Curitiba
18  and he was living in San Paulo -- very well-known name.  And
19  I knew he was big.  When I realized he was already client of
20  Prudential Securities at that time -- probably because of I
21  made a call and he told me, "I'm already a client" and I
22  couldn't handle.
23           In 2008, I was sharing an office with effay, a
24  financial advisor called James Tempo.  And this effay was
25  handling Mr. Igor's account.  And James Tempo was a guy that

```
 1   was really relaxed.  He was not worried with -- even to pay
 2   his living.  And I was worried that he -- I knew he had a
 3   big account because he sat on my side.  And I told him,
 4   "Listen, James.  You have to show this big client you have
 5   potential investment ideas in order you to make a commission
 6   and have a better life."
 7              And then I started giving Mr. James the idea that
 8   I had to offer to Igor.  And at the certain point, James
 9   asked me to tell Mr. Igor the idea which was.  And then I
10   was introduced to Igor over the phone.  And then on 2008 the
11   Brazilian office was closed.  I think James Tempo opted to
12   stay in Brazil, not to come to U.S.  And as I had already
13   had that contact with Mr. Igor and he could be a good
14   client -- a big client, I called him and solicited.
15              "Listen, your account is not -- now with nobody.
16   Would you mind if I take your account?"  And then he signed
17   a letter to authorize to transfer his account to my name.
18       Q    So you've known Mr. Cornelsen since about 2008?
19       A    Yes.
20       Q    And he's been a customer of yours since when?
21       A    2008.
22       Q    How would you characterize your relationship with
23   him?
24       A    Very professional.  He's a very time-consuming
25   customer.  He asks you about everything the whole day about
```

224

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## REPORTER'S CERTIFICATE

I, __Eileen A. Lucio CSR # 10586__, reporter, hereby certify that the foregoing transcript is a complete, true and accurate transcript of the testimony indicated, held on __7-12-12__ at __L.A., CA__ in the matter of: __Burger King Holdings, Inc.__

I further certify that this proceeding was recorded by me and that the foregoing transcript has been prepared under my direction.

Date: __7-13-12__

Official Reporter: __Eileen A. Lucio CSR # 10586__
*Diversified Reporting Service, Inc.*

**Diversified Reporting Services, Inc.**
**(202) 296-9200**
**Fax: (202) 296-9220**