UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                          :
SECURITIES AND EXCHANGE                   :
COMMISSION                                :
                                          :
                          Plaintiff,      :          12 Civ. 7094 (KPF)
                                          :
              v.                          :          OPINION AND ORDER
                                          :
WALDYR SILVA PRADO NETO,                  :
                                          :
                          Defendant.      :
                                          :
------------------------------------------------------X

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED:  June 23, 2014 | |

KATHERINE POLK FAILLA, District Judge:

Non-party Wells Fargo & Company 401(k) Plan (the "Plan") moves for
reconsideration of or, in the alternative, relief from this Court's January 7,
2014 Order entering a final judgment against Defendant Waldyr Silva Prado
Neto.  That Order, among other things, imposed a civil penalty and required the
disgorgement of certain profits obtained by Prado from insider trading in
securities; the Court ordered that the penalty and disgorgement could be
satisfied by, among other assets, funds ostensibly representing Defendant's
liquidated assets in the Plan (the "Funds").  The Order further required that the
Funds be transmitted by the Plan and by Wells Fargo Bank, N.A., the financial
institution at which the Funds are being kept (the "Bank"), to Plaintiff
Securities and Exchange Commission (the "SEC").

The Plan now seeks relief from the Court under Local Civil Rule 6.3 and
Federal Rule of Civil Procedure 60(b), arguing that the Employment Retirement
Income Security Act of 1974 ("ERISA"), Pub. L. 93-406, 88 Stat. 829, prohibits

it from transferring the Funds to Plaintiff.  Indeed, the Plan argues, if it does transfer those funds, it will lose its tax-qualified status.  The Plan's motion under Rule 60(b) is denied because it lacks standing to pursue that motion. The Plan's motion for reconsideration is denied because the Plan has failed to demonstrate that the Funds are Plan assets subject to ERISA's anti-alienation provision.

## BACKGROUND[1]

### A.    Procedural Background

On September 20, 2012, Plaintiff SEC filed a complaint against Defendant Prado that alleged violations of Sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78n(e), and Exchange Act Rules 10b-5 and 14e-3, 17 C.F.R. §§ 240.10b-5 & 240.14e-3, predicated on Prado's insider trading in the securities of Burger King Holdings, Inc.  (Dkt. #1). That same day, Plaintiff sought *ex parte* emergent relief from the Court, filing a temporary restraining order, order to show cause, order freezing assets, and other requests for relief against Defendant.  (*See* Dkt. #3).

Plaintiff's *ex parte* application was granted that day, and Defendant was ordered to show cause why a preliminary injunction and asset freeze should not be granted in accordance with Plaintiff's application.  (Dkt. #3).  Defendant did not respond to the order to show cause, and on October 10, 2012, the

---

[1]     The Court assumes familiarity with the facts of this case, and only includes those facts pertinent to the pending motion.  Certain facts set forth herein are drawn from the Declaration of Dee Dee Holland ("Holland Decl.") (Dkt. #52), and from the Declaration of David S. Brown ("Brown Decl.") (Dkt. #9).  For convenience, the parties' memoranda of law will be referred to as follows: the Plan's opening brief as "Plan Br."; the SEC's brief in opposition as "Pl. Opp."; and the Plan's reply brief as "Plan Reply."

Court granted Plaintiff's request for a preliminary injunction freezing Defendant's assets, including assets contained in accounts maintained by the Bank, Wells Fargo Advisors, LLC, and the Plan.  (Dkt. #15).

On January 7, 2014, after Defendant defaulted, the Court entered a final judgment (the "Final Judgment") holding Defendant liable for disgorgement of $397,110.01, representing profits gained as a result of the conduct alleged in the complaint, together with prejudgment interest thereon in the amount of $41,622.90; the Court further found that Defendant was liable for a civil penalty of $5,195,500 pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u(a).  (Dkt. #46).[2]  The Court further ordered that the judgment against Defendant could be satisfied by relinquishing all legal and equitable right, title, and interest in the assets and funds frozen subject to the Court's asset freeze orders, including, as relevant to the pending motion, the Funds.  (*Id*.).  To that end, the Court ordered the Bank and the Plan to transmit the Funds to Plaintiff within 14 days of the Final Judgment.  (*Id*.).

## B.   Defendant's 401(k) Plan Account

Defendant Prado was a former employee of Wells Fargo Advisors, LLC, and, in that capacity, maintained an ERISA-governed retirement plan account with the Plan.  (Holland Decl. ¶ 9).  On September 6, 2012 — immediately prior to (and presumably in expectation of) the actions taken by the SEC — Prado submitted or caused to be submitted a request to the Plan to liquidate his

---

[2]     To date, Defendant has failed to appear in this action or otherwise contact the Court with regard to this case.  It is the Court's understanding that Defendant fled the country in or about the fall of 2012.  (Brown Decl. ¶¶ 17-19).

assets in the Plan, and to distribute to him the resulting proceeds.  (Brown Decl. ¶ 24).  Pursuant to that request, on September 7, 2012, the Plan liquidated Defendant's assets, resulting in a cash balance of $162,431.74. (*Id.*).  Thereafter, on September 11, 2012, a check in the amount of $130,292.53 (net of withholdings for federal taxes) made payable to Defendant was issued and sent to Defendant.  (*Id.*; *see also* Holland Decl. ¶ 10).

Plaintiff was informed that Defendant received the check.  (Brown Decl. ¶ 20).  The check, however, was not negotiated before the Court entered its order freezing Defendant's assets on September 20, 2012.  (Holland Decl. ¶ 10).  Currently, Funds totaling $162,431.74, consisting of $130,292.53 that was payable (and paid) to Defendant and $32,139.21 that was withheld for the IRS, are being held in a clearing account at the Bank.  (*Id.* at ¶ 11).

## C.    Procedural History

On January 22, 2014, the Plan filed a motion for reconsideration of, or in the alternative, relief from the Court's Final Judgment.  (Dkt. #50).  Among other things, it requested that "[i]f the Court finds that Mr. Prado's 401(k) retirement plan funds are plan assets that are subject to ERISA's anti-alienation provision . . . the Court clarify the Preliminary Injunction Order dated October 5, 2012, regarding the freeze on Mr. Prado's assets."  (Plan Br. 2).  In support of this motion, Dee Dee Holland averred on behalf of the Plan that the Plan is governed by ERISA, and that it is also a tax-qualified plan, in compliance with the Internal Review Code ("IRC").  (Holland Decl. ¶¶ 5-6).

Plaintiff filed its opposition on February 5, 2014 (Dkt. #59), and the motion was fully submitted on February 18, 2014, when the Plan filed its reply (Dkt. #62).

In light of certain deficiencies in the record, the Court convened oral argument in the matter on June 5, 2014; counsel for the Plan and for Plaintiff SEC attended.  At oral argument, the Court requested proof — be it Plan documents, ERISA provisions, or interpretive regulations and case law — that the Funds had not been "distributed" (since distribution would vitiate the anti-alienation provision), in spite of the liquidation of Defendant Prado's 401(k) account and the subsequent issuance to him of a check reflecting those benefits.  Counsel for the Fund contended that "[i]t's pretty clear, we believe, from the [P]lan's position and from the Department of Labor and the available case law that until that money is actually in Mr. Prado's hands, it is subject to ERISA and the plan, and its fiduciaries are legally responsible for those funds." (June 5 Tr. 4).  Counsel noted, however, that she did not believe there was a Plan provision specifically addressing uncashed distribution checks.  (*Id.* at 3).

Counsel for Plaintiff disputed the underlying factual premise of the Plan's arguments, namely that the Funds had not been "distributed":

> It raises the question that calls into doubt whether the funds are within the plan's control, which is the representation that was made here today. The funds are being held in a noninterest bearing account at Wells Fargo Bank only because the plan had to put the money somewhere, pending a final determination from this Court as to what to do with that. So I believe that it is a misapplication and mischaracterization of the facts in this case to say that ERISA applies at all because the fund[s] had been withdrawn from the account and, but for the asset freeze, [Defendant] probably would have gotten them.

> Wells Fargo as an entity had to put the cash somewhere and chose
> to put it in a noninterest-bearing checking account.  I believe it is a
> red [herring] to say that the anti-alienation clause of ERISA protects
> these funds at all because they are not held in the plan.

(June 5 Tr. 13; *see also id.* at 16 ("The only reason they have not left Wells

Fargo as an entity is because of the asset freeze, not because of any obligation

for them to remain at Wells Fargo because of the plan.")).  As support for

Plaintiff's argument, counsel introduced an October 5, 2012 letter from

Lawrence J. Brundick, Senior Counsel in Wells Fargo's Law Department, to

Plaintiff (the "Brundick Letter"); in it, Brundick suggested that the Funds be

"returned to Mr. Prado's 401(k) Plan account" — a suggestion obviated by this

Court's asset freeze order.

One day after the oral argument, on June 6, 2014, counsel for the Plan

submitted a letter to the Court correcting a misstatement made during the

argument.  (Dkt. #92).  In particular, counsel noted that the Plan in fact

contained a provision for uncashed checks, and included that excerpt from the

Plan documents.  Of significance to the instant motion, counsel did not attempt

in the letter to provide substitute legal or documentary support for the

arguments she had made at oral argument, which arguments were predicated,

in varying degrees, on her erroneous recollection of Plan provisions.  Counsel

for Plaintiff responded by letter dated June 10, 2014, arguing that the language

of the Plan provision for uncashed checks "underscores the fact that funds are

removed from the Plan when the check is issued" (Dkt. #94 at 1), and, further,

that the Plan's language regarding distributions dovetailed with Plaintiff's

interpretation of the Brundick Letter.

A word about these two documents, the Plan and the Brundick Letter, is in order.  Section 10.19 of the Plan is entitled "Uncashed Checks or Inability to Locate Distributee."  (Holland Decl., Ex. A § 10.19).  With respect to the former category, Section 10.19(a) proposes three alternatives (based on the status of the distributee) for situations in which "all or part of the benefit of a Participant, Beneficiary or Alternate Payee has been distributed pursuant to the provisions of the Plan to the individual entitled to the benefit but the check representing such distribution remains uncashed." (*Id.*).  Two of the alternatives involve the Plan redepositing or reinvesting the funds into the Plan, while the third involves a forfeiture; all three are subject to reversal if the distributee later comes forward to claim his or her benefits.[3]  Thus, under the plain language of the Plan, issuance of a check is itself distribution of the benefits to which the participant or distributee is entitled, even if "the check representing such distribution remains uncashed."

This definition of "distribution" is also evident from the text of the Brundick Letter.  As a preliminary matter, Brundick acknowledges that the check issued to Defendant Prado was a "distribution check" by terming it thusly.  (Brundick Letter at 1).  More importantly, Brundick's letter makes clear that, at least to Wells Fargo's Law Department, issuance of the check to Defendant Prado constituted distribution of Prado's interest in the Plan. Among other things, Brundick notes that (i) as of October 5, 2012, the Funds

---

[3]     Each of the alternatives contemplates some form of prior notice to the plan participant or distributee.  The Plan has not argued that these notice requirements have been satisfied with respect to Defendant Prado.

"have not been redeposited into . . . Mr. Prado's 401(k) Plan account"; (ii) the Plan believes that the Funds "must be returned to Mr. Prado's 401(k) Plan account"; and (iii) the Plan proposes "returning these monies" or "placing this money back" into Defendant's 401(k) plan account.  (*Id.* at 1-2).[4]

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions for Reconsideration Under Local Rule 6.3

"The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court."  *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383, 403 (S.D.N.Y. 2011) (citing *Patterson* v. *United States,* No. 04 Civ. 3140 (WHP), 2006 WL 2067036, at *1 (S.D.N.Y. July 26, 2006)).  Under Local Rule 6.3, the moving party must "point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader* v. *CSX Transp. Inc.*, 70 F.3d 255, 57 (2d Cir. 1995) (internal citations omitted) (noting that the standard for granting motions for reconsideration is "strict").  "A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court."  *Davidson* v. *Scully*, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001) (citing *Shrader*, 70 F.3d at 257).

---

[4]    Plaintiff rejected Brundick's suggestion in a letter dated October 9, 2012, that attached several orders of this Court.  Plaintiff echoed Brundick's suggestion that the distribution had already taken place by, for example, referring to the monies at issue as Defendant's "401(k) Plan distribution funds."

Such a motion should not be made to "reflexively [] reargue those issues already considered when a party does not like the way the original motion was resolved," and is not a substitute for an appeal.  *In re Optimal U.S. Litig.*, 813 F. Supp. 2d at 387 (citing *Makas* v. *Orlando*, No. 06 Civ. 14305 (DAB) (AJP), 2008 WL 2139131, at *1 (S.D.N.Y. May 19, 2008)); *Grand Crossing, L.P.* v. *U.S. Underwriters Ins. Co.*, No. 03 Civ. 5429 (RJS), 2008 WL 4525400, at *3 (S.D.N.Y. Oct. 6, 2008) (citing *Morales* v. *Quintiles Transnational Corp.*, 25 F. Supp. 2d 369, 372 (S.D.N.Y. 1998)).  At its core, "[r]econsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"  *Parrish* v. *Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (citing *In re Health Mgmt. Sys. Inc. Secs. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).

## 2. Motions for Relief from a Court Order Under Federal Rule of Civil Procedure 60(b)

Federal Rule of Civil Procedure 60(b) provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). "The decision whether to grant a party's Rule 60(b) motion is committed to the 'sound discretion' of the district court." *Stevens* v. *Miller*, 676 F.3d 62, 67 (2d Cir. 2012) (quoting *Montco, Inc.* v. *Barr (In re Emergency*

*Beacon Corp.)*, 666 F.2d 754, 760 (2d Cir. 1981)).  As relevant here, relief under Rule 60(b)(6) "is warranted where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served."  *United Airlines, Inc.* v. *Brien*, 588 F.3d 158, 176 (2d Cir. 2009) (internal quotation marks omitted); *United States* v. *Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001) (Rule 60(b) relief is "generally not favored and is properly granted only upon a showing of exceptional circumstances.").  Motions under Rule 60(b) "must be made within a reasonable time — and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of proceeding."  Fed. R. Civ. P. 60(c).

## B.    The Plan's Motion for Reconsideration

### 1.    The Plan Has Standing to Bring a Local Rule 6.3 Motion

Plaintiff charges that the application of Rule 6.3 is limited to parties, and because the Plan is not a party to this litigation it cannot avail itself of this rule.  (Pl. Opp. 12).  Plaintiff points to the rule's requirement that "[n]o affidavits shall be filed by *any party* unless directed by the Court."  Local Rule 6.3 (emphasis added).  Plaintiff has not cited, and the Court has not located, any case explicitly limiting Rule 6.3 to parties to the litigation.  To the contrary, and as the Plan points out, courts in this District have allowed affected non-parties to a litigation to file motions for reconsideration under Rule 6.3.  *See, e.g.*, *Intellectual Property Watch* v. *U.S. Trade Representative*, No. 13 Civ. 8955 (ER), 2014 WL 852168, at *1 (S.D.N.Y. Jan. 31, 2014) (denying a non-party's

motion for reconsideration of the court's denial of the non-party's motion to intervene); *Wultz* v. *Bank of China Ltd.*, 291 F.R.D. 42, 45 (S.D.N.Y. 2013) (adjudicating motion of non-party Office of the Comptroller of the Currency for reconsideration challenging the court's order granting plaintiffs' motion to compel certain documents); *Tiffany (NJ) LLC* v. *Forbse*, No. 11 Civ. 4976 (NRB), 2012 WL 3686289, at *1 (S.D.N.Y. Aug. 23, 2012) (denying non-party's motion for reconsideration challenging the court's order requiring the non-party "to comply with discovery provisions of the preliminary injunction entered by the Court"); *In re Currency Conversion Fee Antitrust Litig.*, MDL No. 1409 (WHP), 2004 WL 1663601, at *1 (S.D.N.Y. July 27, 2004) (denying a non-party's motion for reconsideration of the court's order granting the defendant's motion to compel the non-party's compliance with a subpoena).

Allowing a non-party to move the court to reconsider a prior decision is both equitable and judicially prudent. If a non-party were prohibited from filing a motion for reconsideration, this traditional avenue of recourse would be unavailable to challenge, for example, a denial of a motion to intervene or a motion to comply with a subpoena, both of which customarily implicate non-parties. What is more, denying the non-party this avenue of equitable relief would do a disservice to the judicial system by allowing decisions that may call out for reconsideration to go unnoticed, thereby enshrining erroneous precedent. In line with other courts in this District, the Court will permit the

Plan's motion for reconsideration to go forward, and address the merits of the motion below.[5]

## 2.   The Funds Are Not Plan Assets, and Thus Are Not Subject to ERISA's Anti-Alienation Provision

The Plan's arguments for reconsideration stem from its position that the Funds remain Plan assets. Because the Plan has failed to substantiate this position, the Court declines its request for reconsideration.

Section 1056(d)(1) of Title 29 of the United States Code, commonly referred to as ERISA's anti-alienation provision, provides that: "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). The relevant Plan documents comply with this provision by stating: "[e]xcept as otherwise expressly permitted by the Plan or required by law, the interests of persons entitled to benefits under the Plan may not in any manner whatsoever be assigned or alienated, whether voluntarily or involuntarily, or directly or indirectly." (Holland Decl., Ex. A § 10.12).

---

[5]      As previously indicated, Rule 6.3 provides that "[n]o affidavits shall be filed by any party unless directed by the Court." Plaintiff argues that because the Plan submitted the Holland Declaration in support of its motion without permission from the Court, its motion should be denied. (Pl. Opp. 12). The Plan counters by arguing that the Holland Declaration was properly submitted in connection with its Rule 60(b) motion, and because it is not a party to this litigation (and therefore was not represented at the proceedings that resulted in the Final Judgment) the Holland Declaration was the only way by which it could provide the necessary evidence before the Court. (Plan Reply 7 n.5). "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). In that regard, the Court may overlook the Plan's submission of the Holland Declaration without prior approval. There is even more reason to do so here. The Court accepted evidence from both parties at oral argument, the substance of which was the same as that contained in the Holland Declaration. Accordingly, there is no reason not to consider the Holland Declaration, and the Court declines to deny the Plan's motion on this procedural hiccup.

The Supreme Court has held that Section 1056(d)(1) "erects a general bar to the garnishment of pension benefits from plans covered by [ERISA]." *Guidry* v. *Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 371 (1991). In *Guidry*, the Supreme Court explained that Section 1056(d)(1) "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners ... even if that decision prevents others from securing relief for the wrongs done them." *Id.* at 376. The Second Circuit has similarly recognized that "the principal rationale behind ERISA's anti-alienation provision is 'the prohibition of involuntary levies by third party creditors on vested plan benefits.'" *Kickham Hanley P.C.* v. *Kodak Retirement Income Plan*, 558 F.3d 204, 210 (2d Cir. 2009) (quoting *Ellis Nat'l Bank of Jacksonville* v. *Irving Trust Co.*, 786 F.2d 466, 470 (2d Cir. 1986)). "Such a prohibition supports Congress's primary objective of ensuring through ERISA that, 'if a worker has been promised a defined pension benefit upon retirement — and if he has fulfilled whatever conditions are required to obtain a vested benefit ... he actually receives it.'" *Id.* (quoting *Ellis Nat'l Bank of Jacksonville*, 768 F.2d at 471).

It is against this backdrop that the Plan mounts its motion for reconsideration in arguing — albeit implicitly — that the Court overlooked controlling decisions that prohibit the assignment or alienation of funds vested in ERISA-covered plans. For starters, the Plan contends that it is prohibited from transmitting the Funds to Plaintiff because to do so would violate ERISA's anti-alienation provision. (Plan Br. 1-2). From there, the Plan points to

Section 401 of the IRC, which provides that "[a] trust shall not constitute a qualified trust under this section unless the plan ... may not be assigned or alienated," 26 U.S.C. § 401(a)(13), from which it reasons that if it does transmit the Funds to Plaintiff, it will lose its tax-qualified status under the IRC, which will have detrimental consequences (including significant adverse tax consequences) to the Plan and its remaining participants. (*Id.* at 13).

The Second Circuit has made clear that ERISA's anti-alienation provision does not apply once the benefits "have left the hands of the administrator." *Robbins ex rel. Robbins* v. *DeBuono*, 218 F.3d 197, 203 (2d Cir. 2000), ("Section 1056(d)'s requirement that pension plans contain a provision against assignment or alienation of benefits does not read comfortably as a prohibition against creditors reaching pension benefits once they have left the hands of the administrator."), *abrogated on other grounds by Wojchowski* v. *Daines*, 498 F.3d 99 (2d Cir. 2007); *accord United States* v. *Jaffe*, 417 F.3d 259, 267 (2d Cir. 2005). In that regard, "once the proceeds of the pension plan have been released to the beneficiary's hands, ... creditors and others [may] pursue claims against the funds and the funds' owner(s)." *United States* v. *All Funds Distributed To, or o/b/o Weiss*, 345 F.3d 49, 57 (2d Cir. 2003); *accord Kickham Hanley P.C.*, 558 F.3d at 211.

The Plan does not dispute the inapplicability of ERISA's anti-alienation provision once the benefits have been distributed. (Plan Br. 9). Rather, it contends that because the check to Prado for the post-liquidation, post-withholdings Funds was stopped by the Court's order freezing his assets, and

thus was never deposited by Prado, the Funds are still "plan assets and subject to ERISA." (*Id.* at 12).  The Court cannot accept this argument, and the cases on which the Plan relies in support of its position do not convince the Court otherwise.

The principal problem with the Plan's arguments is that they lack record support.  The Plan admits that "[a] distribution request was made for the funds in Mr. Prado's account with the [Plan], and a check payable to Mr. Prado was issued." (*See* Holland Decl. ¶ 10).  It further acknowledges that the Funds are being held in a non-interest bearing clearing account at the Bank.  (*Id.* at ¶ 11; Brundick Letter at 1).  The Plan concedes that the only reason that the Funds were placed in this clearing account was to comply with the Court's order freezing the assets in the Plan.  (*See* Holland Decl. ¶¶ 10-11).  Thus, it is only because this Court froze Defendant's assets that the Funds remain in the clearing account as opposed to in Defendant's custody.

Section 10.19 makes clear that a participant's benefits are distributed, for anti-alienation purposes, at the time the check is issued.  As Plaintiff notes (Dkt. #94 at 1), the provision explicitly recites that it applies where "all or part of the benefit of a Participant, Beneficiary or Alternate Payee *has been distributed* pursuant to the provisions of the Plan to the individual entitled to the benefit but the check representing such distribution remains uncashed." (Holland Decl., Ex. A § 10.19 (emphasis added)).  In other words, distribution under the Plan occurs with the issuance of the check, irrespective of when and whether it is cashed.

If the text of the Plan were not sufficiently clear, the Brundick Letter confirms the Court's understanding of when distribution occurs under the Plan. Brundick advised Plaintiff that "monies … covering Mr. Prado's distribution check" (i.e., the Funds) were being held in a non-interest bearing account after the Court issued a temporary restraining order freezing Defendant's assets. (Brundick Letter at 1). He then repeatedly noted that the Funds had not been redeposited into the Plan, and sought Plaintiff's agreement for the Plan administrators to "return" or "redeposit" or "place back" the Funds into the Plan — again underscoring that distribution had already occurred and the Funds were no longer part of the Plan. (*Id.* at 1-2).

It bears noting that at no point in the letter did Brundick suggest that the anti-alienation provision was in any way implicated, or that the Plan needed to redeposit those funds in order to maintain its tax-qualified status. (*Cf. id.* at 1 ("However, since there was a 'stop payment' issued on this distribution check, Plan Administration for the 401(k) Plan has concerns about simply keeping these funds in the account maintained by the 401(k) Plan's record keeper, and they believe as plan fiduciary that these monies must be returned to Mr. Prado's 401(k) Plan account.")). Perhaps more importantly, despite receiving copies of the relevant asset freeze orders in September and October of 2012, at no time during the pendency of the asset freeze did the Plan advise the Court of its view that the anti-alienation provision required return of the Funds. Indeed, such an argument, if valid, should have been raised immediately after each freeze order was entered, inasmuch as the Plan's

16

current arguments suggest that the only course of action available to the Court was return of the Funds to the Plan.

Given the Plan's text, the cases relied on by Wells Fargo (which are not binding on this Court in any event) are inapposite.  For example, in *Mogel* v. *Unum Life Ins. Co. of Am.*, when plan participants submitted claims for death benefits in accordance with the terms of their policies, the insurance company issued each participant a checkbook and letter explaining that the death benefits plus any applicable interest had been deposited in a security account with the insurance company and that the participants could write checks, not to exceed the balance in the account.  547 F.3d 23, 25 (1st Cir. 2008).  The court held that issuing the check books to the plan participants did not equate to a transfer of the funds to which the participants were entitled, and thus the funds remained plan assets.  *Id.* at 26.  In reaching this conclusion, the court recognized that "the difference between delivery of a check and a checkbook … is the difference between" the insurance company "retaining" and "divesting possession of [the plaintiff's] funds."  *Id.*  Here, by contrast, the Plan issued a check for the Funds and made repeated statements indicating that the Funds were no longer part of the Plan.  In that respect, under *Mogel*, it divested its possession of the funds.

*Commonwealth Edison Co.* v. *Vega*, another case on which the Plan relies, is also unhelpful.  174 F.3d 870 (7th Cir. 1999).  In *Vega*, the state of Illinois sought to apply its Uniform Disposition of Unclaimed Property Act (the "Uniform Act") to benefits payable under a pension plan that were not yet

17

claimed by a plan beneficiary.  *Id.* at 872.  Under the terms of that plan, when benefits were due to a participant in the plan, the plan issued a check to the participant.  Thus, the money due to participants *remained in the plan's coffers*, until the participant deposited or cashed the check, at which point the check was paid by the plan through the system of clearing bank transactions. *Id.*  When the check was issued, it is placed in a separate account, but if the check was not cashed within one year, the money was retransferred to a general account where is became available to pay other participants.  *Id.*

The *Vega* Court held that ERISA preempted the Uniform Act, and in so doing reasoned that the "until the check to the beneficiary is actually presented to the plan for payment through the banking system, and paid, the money due to the beneficiary is an asset of the plan."  174 F.3d at 873.  The Plan has not indicated that it employs a structure similar to the plan in *Vega*, under which that the Funds remain plan assets.  More to the point, the Plan does not retain control over the Funds like the administrators in *Mogel* and *Vega*.  Indeed, its request for direction from the Court as to what to do with the Funds if the Court grants its motion, if anything, further underscores its lack of authority over these funds.

Nor can the Plan take comfort in the Department of Labor provisions and related case law regarding "float accounts."  (*See* Plan Br. 10-11).  A float account may be created where a fiduciary transfers funds to an account of a financial institution in connection with the issuance of a check to make a plan distribution or disbursement, and then earns interest on that account until the

checks are presented for payment.  Department of Labor Field Assistance Bulletin 2002-3 (Nov. 5, 2002).  According to the Brundick Letter, the clearing account into which the Funds were deposited is non-interest bearing, and the Plan has not provided other evidence that the clearing account is a float account potentially subject to ERISA.

The Funds stand on a different footing from other benefit funds for which a check is issued to a participant that the participant fails to deposit.  The record indicates beyond credible dispute that Defendant would have deposited the check he received for the Funds had the Court not entered the order freezing his assets.  And in that regard, unlike the vast majority of Section 1056(d)(1) cases, the Funds are in "a kind of pension fund purgatory," to which ERISA's anti-alienation provision does not apply.

The defendants in *United States Sec. & Exchange Comm'n* v. *Moskop*, No. 10 Civ. 7462 (HDL), 2011 U.S. Dist. LEXIS 68780 (N.D. Ill. June 27, 2011), invoked the anti-alienation provision in seeking access to monthly pension payments that were deposited into an account that had previously been controlled by the defendants, but was then subject to an asset freeze.  The district court denied the request:

> Defendants argue that ERISA's anti-alienation provision protects this pension from the court-imposed asset freeze. 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."). The flaw in Defendants' argument is that all but one circuit which has considered this issue has held that this provision applies to retirement benefits when they are held by the plan administrator, not when they reach the beneficiary. A court in this circuit has adopted the majority rule.

The catch that exists here is that Moskop does not currently have access to the funds once they are deposited into his bank account, as the account is frozen. This has the practical effect of alienating Moskop's pension funds prior to his possession of them and after the plan administrator has relinquished control of them — a kind of pension fund purgatory. However, assuming, *arguendo*, that the funds are removed from the frozen account, they would enter into Moskop's possession, at which time they would immediately become subject to the November 27, 2010, asset freeze. ERISA's anti-alienation provision in § 1056(d)(1), therefore, simply does not apply to the situation that exists with Moskop's Prudential pension. The monthly pension payments are properly subject to the Court's asset freeze Order.

*Id.* at *2-3 (internal citations omitted).

Prado elected to withdraw the funds available in his 401(k) plan. At the moment he made that voluntary election, he forfeited the protection provided under ERISA. *Cf. United States* v. *Kalani*, No. S3 98 Cr. 1238-06 (SAS), 2003 WL 21222546, at *2 (S.D.N.Y. May 27, 2003) ("Where any employee elects to draw on [his] ERISA plan prior to [his] retirement, [he] forfeits the protection provided by the Act." (quoting *United States* v. *Smith*, 47 F.3d 681 (4th Cir. 1995)). To hold otherwise would incentivize individuals, like Plaintiff, to attempt to secrete 401(k) assets with the comfort of knowing that if efforts to obtain those assets fail, the funds will not be subject to any subsequent judgment.[6]

The *Kalani* Court also noted the conclusions of several Circuit Courts of Appeals that "ERISA's anti-alienation provision applies only to actions brought against a retirement plan, not to actions against a beneficiary." 2003 WL

---

[6]     The Plan is correct that *Kalani* and *Smith* arose in the context of criminal prosecutions. (*See* Plan Reply 2-3). However, the particular principles of law for which they are cited exist irrespective of whether the matter is civil or criminal.

21222546, at *2 (citing, *inter alia*, *Trucking Employees of N. Jersey Welfare Fund, Inc.* v. *Colville*, 16 F.2d 52, 56 (3d Cir. 1994) ("The regulation construes the statute to forbid alienation of rights to future payments, rather than alienation of the actual money paid out.")).  This case, quite obviously, is an action against a beneficiary, and Plaintiff is correct that the Final Judgment was filed as to Prado, and "placed 'no restraint on funds that remain in the custody of an ERISA plan administrator.'"  (Pl. Opp. 10-11 (quoting *United States* v. *Jaffe*, 417 F.3d at 267)).

Put simply, the Court does not doubt the existence, or the significance, of the anti-alienation provision.  Instead, it must conclude on this record that the Plan has failed to demonstrate that the Funds are Plan assets subject to that provision.  The cases on which the Plan relies are rendered inapposite by the language of the Plan (and the conduct of Plan personnel), which make clear that funds are no longer Plan assets when they are liquidated and a check is issued to the participant or distributee.  The policy concerns animating the provision are, similarly, not at all implicated here, where a sophisticated insider trader cashed out his Plan account before fleeing the country.  Accordingly, the Funds are not subject to the anti-retaliation provision, and the Plan's motion for reconsideration must be denied.

## C.     The Plan's Motion for Relief Under Rule 60(b)

The Plan's alternative request for relief under Federal Rule of Civil Procedure 60(b) fails because it lacks standing to bring such a motion.  Rule 60(b) states, in part, that a "court may relieve a party or a party's legal

representative from a final judgment, order, or proceeding…."  Fed. R. Civ. P. 60(b).  Unlike Rule 6.3, the application of Rule 60(b) is, by the text of the rule, reserved for parties to the lawsuit.  Wells Fargo is neither a party to this action nor a party's legal representative.

Although Rule 60(b) relief is "not ordinarily … available to non-parties," the Second Circuit has allowed non-parties to move pursuant to Rule 60(b) where "on the facts of th[e] case [the movants] were sufficiently connected and identified with the … suit to entitle them to standing to invoke [Rule 60(b)]." *Dunlop* v. *Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1052 (2d Cir. 1982); *see also Grace* v. *Bank Leumi Trust Co. of NY*, 443 F.3d 180, 188 (2d Cir. 2006). This exception, however, is extraordinarily narrow.  Indeed, in *Dunlop* and *Grace*, where the Second Circuit recognized this exception, the Court made clear that the holdings were limited to the facts of those cases.  *Dunlop*, 672 F.2d at 1052 ("Although Rule 60(b) (6) would not ordinarily be available to non-parties to modify final judgments, we hold that *on the facts of this case* appellants were sufficiently connected and identified with the Secretary's suit to entitle them to standing to invoke Rule 60(b)(6)." (emphasis added)); *Grace*, 443 F.3d at 188 ("Today, as in *Dunlop*, we limit our decision to the facts of this case….").

In *Dunlop*, the Court held that non-parties had standing to move under Rule 60(b) to amend a stipulation of dismissal entered in a federal action to which they were not a party where, under the terms of the stipulation, the non-

parties were barred from bringing any subsequent age discrimination state-law

claims.  672 F.2d at 1052.  In *Grace*, the Court held that:

> [W]here plaintiffs enter into a settlement agreement with a
> judgment-proof, *pro se* defendant with the intent at the time of the
> settlement to collect from a third party that allegedly received
> fraudulent conveyances, and further, they attempt to use the
> judgment as a predicate for a fraudulent conveyance action against
> the third party, the third party is "strongly affected" by the judgment
> and entitled to standing to bring a Rule 60(b) motion.

*Grace*, 443 F.3d at 188.

The Plan's circumstances do not fall within the parameters of *Dunlop* or

*Grace*, and thus this is not such an "extraordinary circumstance" to warrant

this Court to "expand the narrow exception to the general rule that non-parties

cannot bring Rule 60(b) motions." *Federman* v. *Artzt*, 339 F. App'x 31, 34 (2d

Cir. 2009) (summary order).  The Plan was neither individually involved in nor

sufficiently connected to this lawsuit.  Rather, it is only tangentially related to

the instant case through its involvement with the Funds that the Court ordered

could be used to satisfy the penalty and disgorgement awards.  Accordingly,

the Plan lacks standing to bring its Rule 60(b) motion.  *See Federman*, 339 F.

App'x at 34 (holding that the movants did not have standing to bring a Rule

60(b) motion seeking relief from a global settlement that restricted the movants'

ability to file suit); *In re Britannia Bulk Holdings Inc. Sec. Litig.*, No. 08 Civ. 9554

(DLC), 2010 WL 446529, at *2 (S.D.N.Y. Feb. 9, 2010) (holding that the non-

party did not have standing to bring a Rule 60(b) motion because "[t]he

circumstances of [that] litigation [did] not resemble those of either *Dunlop* or

*Grace*"); *see also Estate Shefner* v. *Tuchman*, No. 08 Civ. 4443 (LTS), 2013 WL

2922387, at *3 (S.D.N.Y. June 14, 2013) (holding that non-parties were precluded from bringing a motion under Rule 60(b) because "[t]he limited exception recognized in *Grace* [was] inapplicable").

## CONCLUSION

The Plan's motions for reconsideration pursuant to Local Civil Rule 6.3 and Rule 60(b) of the Federal Rules of Civil Procedure are DENIED.  The Court orders the transfer of the $130,292.53, representing Prado's liquidation and distribution of his 401(k) plan, to Plaintiff in satisfaction of the Final Judgment.

The Clerk of Court is directed to terminate Docket Entry 50.

SO ORDERED.

Dated:  June 23, 2014
        New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge